[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 02-16886
_____

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 15, 2004
THOMAS K. KAHN
CLERK**

D.C. Docket No. 02-00171 CV-CDL-4

ROY L. BOURGEOIS,
JEFF WINDER,
BECKY JOHNSON,
ERIC LECOMPTE,
SCHOOL OF THE AMERICAS WATCH,

Plaintiffs-Appellants,

versus

BOBBY PETERS,
WILLIE L. DOZIER
CONSOLIDATED GOVERNMENT OF COLUMBUS, GEORGIA,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

**(October 15, 2004)**

Before TJOFLAT, BIRCH and GOODWIN[*], Circuit Judges.

TJOFLAT, Circuit Judge:

The plaintiffs in this case are an organization called "School of the Americas Watch" ("SAW") and several of its members, including SAW's founder, Rev. Roy Bourgeois. The group engages in various forms of nonviolent protest, seeking to pressure the federal government to cut funding to the Western Hemisphere Institute for Security Cooperation, better known as the "School of the Americas" (SOA). The SOA is run by the United States Army and housed at Fort Benning, Georgia. It trains military leaders from other countries throughout the Western Hemisphere in combat and various counterinsurgency techniques. SAW contends that the SOA bolsters military dictatorships by training their leaders how to kill, to torture, and otherwise to suppress their citizens.

As part of its ongoing efforts to shut down the SOA, the SAW engages in an annual protest each November on property open to the public immediately outside of Fort Benning. Approximately 15,000 people attend the demonstration each year. Throughout the thirteen-year history of these protests, no weapons have ever been found at the protest site, and no protestor has ever been arrested for an act of

---

[*] Honorable Alfred T. Goodwin, United States Circuit Judge for the Ninth Circuit, sitting by designation.

violence.  Each year, however, a small number of protestors violate 18 U.S.C. § 1382 by entering onto Fort Benning and attempting to march to the SOA,[1] which is actually located a few miles inside the base.

In November 2002, a week before that year's protest, the City of Columbus ("the City") instituted a policy requiring everyone wishing to participate in the protest to submit to a magnetometer (essentially, a metal detector) search at a checkpoint "a couple of long city blocks" away from the SAW protest site.  If the magnetometer indicated the presence of metal as a protester was walking through it, police would physically search that individual's person and belongings.  The police estimated that protestors "would probably have to arrive . . . an hour and a half, maybe 2 hours, ahead of time" to get through the metal detector checkpoints

---

[1]  The law provides:

> Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or
>
> Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—
>
> Shall be fined under this title or imprisoned not more than six months, or both.

18 U.S.C. § 1382.

to the protest site.

The City contends that its decision to conduct mass searches was based on several factors. First, the Department of Homeland Security threat assessment level was "elevated," indicating a "significant" risk of attack. Second, protestors in previous years had demonstrated a history of "lawlessness" because many of them engaged in frenzied dancing, did not immediately disburse at the end of the scheduled protest, and "formed a 'global village' from large debris." In addition, some of them ignited a smoke bomb, and a few entered onto Fort Benning in a peaceful march to the SOA. Finally, SAW had invited several "affinity groups"—in particular, the Anarchists—to attend the protest that had allegedly instigated violence at other, unrelated protests such as the one that led to a riot in Seattle during a 1999 meeting of the World Trade Organization.[2]

SAW immediately sought a temporary restraining order and preliminary injunction from the United States District Court for the Middle District of Georgia,[3] alleging that the searches violated protestors' First and Fourth

---

[2] The proposed magnetometer searches, which do nothing more than detect the presence of metal, would have done little, if anything, to deter or to interdict any of this conduct.

[3] The complaint also sought damages, but since the searches had not occurred at the time of the trial on the merits, the damages issue was not yet ripe. Although SAW is free to file a new § 1983 suit for damages (subject, of course, to the statute of limitations), we have no occasion to consider the damages claim from their original complaint.

Amendment rights. Two days later, the court held a hearing on preliminary relief, which the parties agreed to consolidate with the trial on the merits. The court refused to enter an injunction and instead dismissed the complaint. As a result, the City conducted the magnetometer searches as planned. SAW appeals the denial of a permanent injunction against the magnetometer searches. While this appeal was pending, in November 2003, SAW again held a protest, and the City again conducted magnetometer searches.

We conclude that these searches violate the First and Fourth Amendments to the Constitution. Part I of this opinion explains why this case falls within the exception to the mootness doctrine for issues that are "capable of repetition, yet evading review." Part II discusses how the City of Columbus search policy contravenes the Fourth Amendment, while Part III sets forth the reasons why the searches violate the First Amendment. Part IV briefly concludes.

I.

Before reaching the merits of this matter, we must first determine whether we may exercise jurisdiction over it. Because Article III of the Constitution limits the jurisdiction of federal courts to "cases and controversies," Nat'l Adver. Co. v. City of Ft. Lauderdale, 934 F.2d 283, 285-86 (11th Cir. 1991), we cannot entertain this appeal unless an actual dispute continues to exist between the parties. If the

matter has become moot, we must vacate the district court's ruling and dismiss the case. See De La Teja v. United States, 321 F.3d 1357, 1364 (11th Cir. 2003) ("[W]hen an issue in a case becomes moot on appeal, the court not only must dismiss as to the mooted issue, but also vacate the portion of the district court's order that addresses it."). The City points out that the original complaint sought an injunction against mass searches at SAW's 2002 protest. Because that protest occurred over two years ago, they argue, this matter is moot. The point is well-taken. "Past injury from alleged unconstitutional conduct does not in itself show a present case or controversy regarding injunctive relief, if unaccompanied by current adverse effects." Lynch v. Baxley, 744 F.2d 1452, 1456 (11th Cir. 1984).

There is an exception to this general rule, however. We may entertain a moot case if it arises from a situation that is "capable of repetition, yet evading review." Alabama Disabilities Advocacy Program v. J.S. Tarwater Devel., 97 F.3d 492, 496 n.1 (11th Cir. 1996) ("[E]ven if the appeal would otherwise be moot, this case is an appropriate one to decide on the merits because the challenged action is capable of repetition, yet evading review."). This standard is satisfied where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." Weinstein v.

6

Bradford, 423 U.S. 147, 149, 96 S. Ct. 347, 349, 46 L. Ed. 2d 350 (1975) (per curiam).  As a final requirement, if there exists some alternative vehicle through which a particular policy may effectively be subject to a complete round of judicial review, then courts will not generally employ this exception to the mootness doctrine.  See Sierra Club v. EPA, 315 F.3d 1295, 1303 n.11 (11th Cir. 2002) ("The lawfulness of the Extension Policy can be reviewed in any challenge to EPA's approval of [permanent air quality standards].  Thus, even if the allegedly improper reliance on the Extension Policy [in promulgating interim quality standards] could be repeated, it would not evade review, and the exception to the mootness doctrine does not apply.").  The mass searches at issue in this case satisfy all three prongs of this test.

First, the time between the City's decision to institute magnetometer searches at an SAW protest in a given year and the protest itself is too short to allow full consideration by the district court, this court, and possibly the Supreme Court.  In 2002, the City announced that it was mandating magnetometer searches barely two weeks before the protest; a two week period is clearly insufficient to allow meaningful judicial review.  Even if SAW were to file a preemptive suit for an injunction a full year prior to its next rally, that period of time could well prove insufficient for a complete round of judicial review.  The instant appeal, for

7

example, has been pending in this court close to a year.

We have never definitively stated the amount of time the federal judiciary must have to adjudicate a dispute that would constitute sufficient opportunity for review. Among the time periods that we have held to be insufficient for full judicial review of a dispute are twenty-four hours,[4] an "[e]lection period[]" of unspecified length,[5] and four months.[6] Roe v. Wade, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), sets a useful benchmark in this area; the Supreme Court there held that a 266-day pregnancy is insufficient time to allow for full appellate review. See Dow Jones & Co. v. Kaye, 256 F.3d 1251, 1257 (11th Cir. 2001). Guided by these precedents, as well as our experience with appellate dockets, we conclude that one year is an insufficient amount of time for a district court, circuit court of appeals, and Supreme Court to adjudicate the typical case. Consequently, if this issue arises again regarding a future protest, it is likely to evade review because the protest will occur before the parties have a final ruling on the merits

---

[4] Doe v. O'Brien, 329 F.3d 1286, 1293 (11th Cir. 2003) (holding that because a period of 24 hours was insufficient to allow judicial review of challenged governmental actions, an aggrieved party had standing to challenge them under the "capable of repetition yet evading review" doctrine).

[5] Fla. Right to Life v. Lamar, 273 F.3d 1318, 1324 n.6 (11th Cir. 2001) ("Election periods are too short to fully litigate the constitutionality of [a law] before a given election ends.").

[6] Sierra Club v. Martin, 110 F.3d 1551, 1554 (11th Cir. 1997) ("[T]he four-month term of the preliminary injunction was too short to allow for appellate review prior to its expiration.").

from a court of last resort.

SAW also satisfies the second prong of the "capable of repetition yet evading review" test because it has a "reasonable expectation" that the City will continue to implement mass, warrantless, suspicionless magnetometer searches at SAW protests in future years. Christian Coalition v. Cole, 355 F.3d 1288, 1291 (11th Cir. 2004) ("Only when the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated are federal courts precluded from deciding the case on mootness grounds." (quotation marks omitted)). This standard requires more than a "mere possibility" that the conduct at issue will recur, but far less than absolute certainty. Najjar v. Ashcroft, 273 F.3d 1330, 1340 (11th Cir. 2001); C & C Products, Inc. v. Messick, 700 F.2d 635, 637 (11th Cir. 1983) ("A controversy is not capable of repetition if there is only 'a mere physical or theoretical possibility' of recurrence." (citation omitted)). The threat of future injury may not be "conjectural" or "hypothetical." O'Shea v. Littleton, 414 U.S. 488, 494, 94 S. Ct. 669, 675, 38 L. Ed. 2d 674 (1974). The City bears a "heavy burden" in demonstrating that SAW's expectation that the searches will continue is fanciful or unreasonable. United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S. Ct. 894, 897, 97 L. Ed. 1303 (1953). For this "reasonable expectation" standard to be met, future recurrences must involve substantially the same parties.

See, e.g., Adler v. Duval Cty. Sch. Bd., 112 F.3d 1475, 1478 (11th Cir. 1997) ("Because the complaining students have graduated from high school, there is no reasonable expectation that they will be subjected to the same injury again."); accord Soliman v. United States, 296 F.3d 1237, 1243 (11th Cir. 2002) ("Furthermore, since [the plaintiff] has been removed from the United States and there is absolutely no reason to believe that he will again be detained or force-fed under the same circumstances, the narrow exception for cases that are capable of repetition yet evading review does not apply.").

"Past wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be adverted by the issuing of an injunction." Lynch, 744 F.2d at 1456. The City has argued for over two years that its search policy is constitutional and has continued to implement it even in the face of ongoing litigation. Moreover, there has been no suggestion that the upcoming 2004 protests will be exempt from the search policy.[7] Finally, the basis

---

[7] Indeed, even if the City declared that it would not conduct a search this year, that would not in itself be enough to avoid the "capable of repetition" doctrine. "Where a defendant voluntarily ceases challenged conduct, the case is not moot because nothing would prevent the defendant from resuming its challenged action." Sierra Club v. EPA, 315 F.3d 1295, 1303 (11th Cir. 2003). "[V]oluntary cessation of a challenged practice renders a case moot only if there is no 'reasonable expectation' that the challenged practice will resume after the lawsuit is dismissed." Jews for Jesus v. Hillsborough Cty. Aviation Auth., 162 F.3d 627, 629 (11th Cir. 1998).

10

for exception in this case is not predicated upon an unlikely future confluence of events, such as that in C & C Products, 700 F.2d at 638 (refusing to resolve a mooted discovery dispute under the "capable of repetition yet evading review" doctrine because the plaintiff "would be subjected to [future] disclosure of materials covered by a protective order only if it is involved in another lawsuit in which a protective order has been entered and a nonparty moves to modify the order"). This case also stands in stark contrast to Christian Coalition v. Cole, wherein the government officials facing the prospect of injunction expressly guaranteed that they would not reinstate their unconstitutional policy, in light of an intervening Supreme Court decision. 355 F.3d 1288, 1292-93 (11th Cir. 2004) ("[T]he [plaintiff] has every reason to believe that the [defendant's] representation is genuine, and can reasonably expect that the [defendant] will not [reinstate its unconstitutional policy]."). Consequently, we find that SAW's fear of future magnetometer searches is reasonable.

The City contends that a Fourth Amendment case like this can almost never fit into the "capable of repetition, yet evading review" exception to the mootness doctrine because the decision to implement magnetometer searches is made anew each year, based on circumstances as they exist at that time. While this is a valid point, it does not make this case moot because all of the circumstances that the

11

City deemed sufficient to implement the search in 2002 continue to exist today, and by all indications will continue to persist into the indefinite future.

As noted earlier, the decision to institute magnetometer searches was based on several factors: (1) events at prior protests, (2) the affinity groups likely to get involved, and (3) the "elevated" status of the Department of Homeland Security's threat advisory system. Because all of these circumstances continue to exist and are likely to do so for the foreseeable future, it is quite likely that the City will arrive at the same conclusion regarding future protests and implement mass searches. Thus, SAW may reasonably expect that its future protests will continue to be subject to these searches.

The requirement that the dispute involve the same parties is satisfied in this case. Because this case involves the likelihood of future searches by the City at SAW's annual protest, and many of the plaintiffs are likely to attend these future protests, this requirement is easily met.

Finally, there is no other available method for obtaining a complete round of judicial review of magnetometer searches at upcoming protests. As discussed above, a new lawsuit aimed specifically at an upcoming search is likely to take as long as the instant one and be similarly mooted. For these reasons, we find that we may exercise jurisdiction over the instant dispute, because while moot, it is

12

capable of repetition yet evading review.

## II.

The plaintiffs' first contention is that the mass, suspicionless, warrantless magnetometer searches violate their Fourth Amendment right to be free of "unreasonable searches and seizures." We agree. The City makes several arguments in defense of its searches; we explore each in turn.

## A.

The City's brief begins with the bold declaration that "[l]ocal governments need an opinion that, without question, allows non-discriminatory, low-level magnetometer searches at large gatherings." Appellees' Brief at 13. Citing nothing more than a single case from 1980, the City contends that "[p]ost September 11, 2001, this Court can determine [that] the preventive measure of a magnetometer at large gatherings is constitutional as a matter of law." Id. (citing Donovan v. Dewey, 452 U.S. 594, 606 (1980)).[8]

_____

[8] The City's reference to September 11 is largely new on appeal. It did not attempt to establish by testimony or other evidence that the searches were justified by fear of a terrorist attack. The City's counsel made an oblique reference to that day very briefly during closing argument before the district court: "We've got new terror alerts happening everyday [sic]. We had another one last night. Everybody heard on CNN, for four different cities and hospitals in the U.S., and they don't know who's coming to this event and they can't control who's coming." V2-R15-159. This passing mention of terror is the only time the issue was even plausibly put before the district court.

That mention may have resonated with the district court, which referenced September 11 while issuing its decision from the bench:

13

This argument is troubling. While the threat of terrorism is omnipresent, we cannot use it as the basis for restricting the scope of the Fourth Amendment's protections in any large gathering of people. In the absence of some reason to believe that international terrorists would target or infiltrate this protest, there is no basis for using September 11 as an excuse for searching the protestors.

Even putting aside the City's ill-advised and groundless reference to September 11, its demand for the unbridled power to perform "magnetometer searches at [all] large gatherings" is untenable. The text of the Fourth Amendment contains no exception for large gatherings of people. It cannot be argued that the Framers simply failed to foresee the possibility of large protests of this character. The Assembly Clause of the First Amendment, expressly guaranteeing "the right of the people peaceably to assemble," U.S. Const. amend. I, demonstrates the Framers' commitment to protect individuals exercising this fundamental right from governmental interference. The City's request for the broad authority to

---

> [Law enforcement officers] should be commended for their efforts in a difficult, often impossible job, particularly given the post September 11 environment. They are criticized when their actions appear to tilt too much in favor of public safety and infringe upon fundamental rights, and they are criticized when they do not go far enough and a tragedy results.

V2-R15-162. Nothing in the substance of the court's reasoning, however, reflected a concern that the demonstration at issue in this case was actually a potential source or target of terrorist threats.

14

conduct mass, suspicionless, warrantless searches is similarly bereft of any support from either the Supreme Court or the Eleventh Circuit.

As SAW points out, under the City's theory,

> mass suspicion-less [sic] searches could be implemented for every person who attends any large event including: a high school graduation, a church picnic, a public concert in the park, an art festival, a Fourth of July parade, sporting events such as a marathon, and fund-raising events such as the annual breast cancer walk. And if the government began to pick and choose amongst [sic] these groups, viewpoint discrimination would likely result.

Reply Brief of Appellants at 4.

The City's position would effectively eviscerate the Fourth Amendment. It is quite possible that both protestors and passersby would be safer if the City were permitted to engage in mass, warrantless, suspicionless searches. Indeed, it is quite possible that our nation would be safer if police were permitted to stop and search anyone they wanted, at any time, for no reason at all. Cf. Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (requiring that police demonstrate individualized suspicion that a suspect is armed before frisking him). Nevertheless, the Fourth Amendment embodies a value judgment by the Framers that prevents us from gradually trading ever-increasing amounts of freedom and privacy for additional security. It establishes searches based on evidence—rather

15

than potentially effective, broad, prophylactic dragnets—as the constitutional norm.

We also reject the notion that the Department of Homeland Security's threat advisory level somehow justifies these searches. Although the threat level was "elevated" at the time of the protest, "[t]o date, the threat level has stood at yellow (elevated) for the majority of its time in existence. It has been raised to orange (high) six times." Wikipedia, Homeland Security Advisory System, available at http://en.wikipedia.org/wiki/Department_of_Homeland_Security_Advisory_Syste m (last referenced Aug. 16, 2004). Given that we have been on "yellow alert" for over two and a half years now, we cannot consider this a particularly exceptional condition that warrants curtailment of constitutional rights. We cannot simply suspend or restrict civil liberties until the War on Terror is over, because the War on Terror is unlikely ever to be truly over. September 11, 2001, already a day of immeasurable tragedy, cannot be the day liberty perished in this country. Furthermore, a system that gave the federal government the power to determine the range of constitutionally permissible searches simply by raising or lowering the nation's threat advisory system would allow the restrictions of the Fourth Amendment to be circumvented too easily. Consequently, the "elevated" alert status does not aid the City's case.

B.

The City, quoting the district court, next contends that the search is permissible as a "special needs" search because its purpose is "not to detect unlawful activity or criminal wrongdoing, but . . . [to] detect[] dangerous devices to ensure the safety of participants, spectators, and law enforcement." Appellees' Brief at 10. The Supreme Court has held that warrantless, suspicionless searches are constitutionally permissible in certain narrow cases where they are meant to further "special needs, beyond the normal need for law enforcement." Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653, 115 S. Ct. 2386, 2391, 132 L. Ed. 2d 564 (1995) (quotation marks and citation omitted).

The City contends that the searches here were not intended to further the City's interest in law enforcement, but instead to help to achieve its "special need" to keep the protestors and others safe by detecting weapons and contraband. The City of Columbus and State of Georgia have enacted a variety of laws against the possession or use of certain kinds of weapons, smoke bombs, and incendiary devices to achieve this goal of public safety. As the City admits, many arrests under these laws occurred as a result of these searches. In a case such as this, where the very purpose of a particular law (such as the law banning the possession of certain dangerous items) is to protect the public, and the government protects

17

the public by enforcing that law, it is difficult to see how public safety could be seen as a governmental interest independent of law enforcement; the two are inextricably intertwined.

Under the City's rationale, a search intended to enforce a given law would be permissible so long as the government officially maintained that its purpose was to secure the objectives that motivated the law's enactment in the first place (e.g., public safety) rather than simply to enforce that law for its own sake. Such a distinction is untenable. Moreover, it is difficult to conceptualize what the government's interest in "enforcing a law for its own sake" would be, if not to secure the benefits of having that law enforced. Given "[t]he extensive involvement of law enforcement and the threat of prosecution" in this search, and our inability to tease out a rationale totally independent of the City's interest in law enforcement, we find that the search does not fall within the special needs doctrine. Ferguson v. City of Charleston, 532 U.S. 67, 83-84 & n.20, 121 S. Ct. 1281, 1291 & n.20, 149 L. Ed. 2d 205 (2001); cf. Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 454-55 (1990) (upholding highway sobriety checkpoints run by police who arrested drunk drivers).

Even putting aside this difficulty, the type of search at issue here does not fall within any of the "special needs" exceptions recognized by the Supreme

18

Court.  Both due to the potentially unlimited sweep of the "special needs" standard, as well as to the concerns discussed in Part II.A supra, we decline to take it upon ourselves to craft another exception to the Fourth Amendment's general requirement of individualized suspicion.

C.

The City's final argument is that this search is constitutionally permissible because it is "reasonable."  A necessary ancillary to this argument is that the Fourth Amendment permits all reasonable searches, whether or not the officials conducting them have either a warrant, probable cause, or indeed any degree of individualized suspicion.  The City focuses too much on the grammatical construction of the first half of the amendment, however.  As the Supreme Court reminds us in Chimel v. California, 395 U.S. 752, 765, 89 S. Ct. 2034, 2041, 23 L. Ed. 2d 685 (1969), discussions of reasonableness "must be viewed in the light of established Fourth Amendment principles."

As the Court has repeatedly emphasized, "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specially established and well-delineated exceptions,'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022,

2032, 29 L. Ed. 2d 564 (1971) (quoting Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576 (1967)), which are "jealously and carefully drawn." Jones v. United States, 357 U.S. 493, 499, 78 S. Ct. 1253, 1257, 2 L. Ed. 2d 1514 (1958) ; accord Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043, 36 L. Ed. 2d 854 (1973); Swint v. City of Wadley, 51 F.3d 988, 995 (11th Cir. 1995). Similarly, "[i]n enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution." Chambers v. Maroney, 399 U.S. 42, 51, 90 S. Ct. 1975, 1980, 26 L. Ed. 2d 419 (1970). "A search or seizure is ordinarily unreasonable in the absence of [at least some] individualized suspicion of wrongdoing." City of Indianapolis v. Edmond, 531 U.S. 32, 37, 121 S. Ct. 447, 451, 148 L. Ed. 2d 333 (2000).

Conducting an ad hoc analysis of the reasonableness of the search based on the judge's personal opinions about the governmental and privacy interests at stake, instead of applying the Supreme Court's well-established per se rules regarding warrants, prior judicial scrutiny of proposed searches, probable cause, and individualized suspicion ignores these crucial Fourth Amendment principles. The need to apply these per se rules reaches all searches, whether of the home, office, person, or other location. See, e.g., O'Rourke v. Hayes, 378 F.3d 1201,

20

1206 (11th Cir. 2004) ("[The Fourth Amendment's] protection extends to any area in which an individual has a reasonable expectation of privacy. Offices and other workplaces are among the areas in which individuals may enjoy such a reasonable expectation of privacy." (quotation marks and citations omitted)).[9]

In general, warrantless searches are permissible only where an individual has a substantially reduced expectation of privacy. That expectation of privacy has both a subjective and objective component. That is, a person must both assert or otherwise exhibit a belief in a right to privacy in the object of the search, and

---

[9] The Supreme Court conducted ad hoc balancing in Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), a case involving pat-downs that the City contends is similar to—and, indeed, involved allegedly more intrusive searches than—the instant case. We note that the searches in this case could quite easily be as intrusive or more intrusive than those in Terry because if a magnetometer reveals the presence of metal, the individual and his belongings would be physically searched, and he could likely be asked to remove his shoes, belt, or other articles of clothing. In Terry, in contrast, nothing other than a cursory pat-down could occur unless an officer actually felt something believed to be a weapon.

Putting aside this quibble, the Court employed balancing in Terry because the searches there involved "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." Id. at 20, 88 S. Ct. at 1879. The searches at issue here involve no such long historical pedigree. Moreover, the 12-year history of SAW protests prior to the creation of this policy—as well as the long history of large and sometimes raucous public gatherings without such searches in this case—casts doubt on any claim that officers could not "as a practical matter" conduct their jobs without suspicionless magnetometer searches. Finally, Terry did away with the warrant and probable cause requirements for pat-down searches, but not an individualized suspicion requirement. Id. at 26, 88 S. Ct. at 1883 ("[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual."). Our conclusion in this case is entirely consistent with this rationale, and as discussed at the end of this Subpart, leaves officers with a variety of alternatives approved by the Supreme Court for ensuring that large public gatherings are safe.

21

that expectation must be one that society is prepared to accept as reasonable.

Katz, 389 U.S. at 361, 88 S. Ct. at 516 (Harlan, J., concurring).  Situations in

which such expectations are reduced include automobile searches,[10] searches

incident to arrest,[11] border searches,[12] and searches of open fields,[13] items in plain

view believed to contain contraband,[14] and prisoners' cells.[15]

The logic underlying recognition of these enclaves of diminished protection

simply does not apply here.  In each of those situations, some unique and

---

[10]  Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S. Ct. 2485, 2487, 135 L. Ed. 2d 1031 (1996) (noting that an "individual's reduced expectation of privacy in an automobile" is a justification for the automobile exception to the warrant requirement).

[11]  United States v. Robinson, 414 U.S. 218, 237, 94 S. Ct. 467, 477, 38 L. Ed. 2d 427 (1973) (Powell, J., concurring) ("[A]n individual lawfully subjected to a custodial arrest retains no significant Fourth Amendment interest in the privacy of his person."); see also Mincey v. Arizona, 437 U.S. 385, 391, 98 S. Ct. 2408, 2413, 57 L. Ed. 2d 290 (1978) (accepting the proposition that "one who is legally taken into custody has a lessened right of privacy in his person").

[12] United States v. Montoya de Hernandez, 473 U.S. 531, 539, 105 S. Ct. 3304, 3309, 87 L. Ed. 2d 381 (1985) (noting that "the expectation of privacy [is] less at the border than in the interior" of the country).

[13]  Oliver v.United States, 466 U.S. 170, 180, 104 S. Ct. 1735, 1742, 80 L. Ed. 2d 214 (1984) ("[T]he common law implies, as we reaffirm today, that no expectation of privacy legitimately attaches to open fields").

[14] See, e.g., New York v. Class, 475 U.S. 106, 114, 106 S. Ct. 960, 966, 89 L. Ed. 2d 81 (1986) ("[B]ecause of the important role played by the VIN in the pervasive governmental regulation of the automobile and the efforts by the Federal Government to ensure that the VIN is placed in plain view, we hold that there was no reasonable expectation of privacy in the VIN.")

[15]  Hudson v. Palmer, 468 U.S. 517, 526, 104 S. Ct. 2194, 3200, 82 L. Ed. 2d 393 (1984) ("[S]ociety is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell.").

identifiable heightened state or diminished private interest was a catalytic ingredient in the "reasonable expectations" formula. Because the Fourth Amendment protects people rather than places, for example, individuals have reduced privacy expectations in their automobiles and open fields. See Labron, 518 U.S. at 940, 116 S. Ct. at 2487 (noting that individuals have a reduced privacy expectation in an automobile, "owing to its pervasive regulation"); Oliver, 466 U.S. at 180, 104 S. Ct. at 1742 (explaining that open fields do not share the characteristics of the "sanctity of a man's home and the privacies of life" (quoting Boyd v. United States, 116 U.S. 616, 630, 6 S. Ct. 524, 532, 29 L. Ed. 746 (1886) (quotation marks omitted))). Transborder travel and arrests are two contexts in which compelling state interests may diminish legitimate privacy expectations. See Montoya de Hernandez, 473 U.S. at 539, 105 S. Ct. at 3309 ("These cases reflect longstanding concern for the protection of the integrity of the border. The concern is, if anything, heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics . . . ."); Robinson, 414 U.S. at 234, 94 S. Ct. at 476 ("The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial.").

In this case, ordinary citizens seek to assemble and exercise free speech rights in a public place. Under such circumstances, participants might have a diminished privacy interest in their conversations. See Katz, 389 U.S. at 361, 88 S. Ct. at 516 (Harlan, J., concurring) ("[C]onversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable."). In their persons and property, however, individuals "are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks." Delaware v. Prouse, 440 U.S. 662, 663, 99 S. Ct. 1391, 1401, 59 L. Ed. 2d 660 (1979). Nothing unique to this gathering indicates that reasonable privacy expectations ought to diminish. It is a large gathering, but the line-drawing problems that attend any attempt to decide when a crowd is "too big" for Fourth Amendment purposes should be self-evident. The SAW protest historically has been perhaps an unusually expressive gathering, but it has been unblemished by violence. As a result, the individuals attending the rally retained a legitimate expectation of privacy in their person and possessions. Consequently, the main justification for doing away with a warrant requirement is inapplicable to this case.

"Exigent circumstances" may also excuse the warrant requirement in some cases, but not here. Such searches are permitted when "the inevitable delay

24

incident to obtaining a warrant must give way to an urgent need for immediate action." United States v. Satterfield, 743 F.2d 827, 844 (11th Cir. 1984). Even a search under exigent circumstances must be supported by probable cause. See United States v. Santa, 236 F.3d 662, 668 (11th Cir. 2000) ("A warrantless search is allowed, however, where both probable cause and exigent circumstances exist."); United States v. Pantoja-Soto, 739 F.2d 1520, 1523 (11th Cir. 1983) ("When exigent circumstances coexist with probable cause, the Fourth Amendment has been held to permit warrantless searches and seizures."). The mass searches here were not. Moreover, a person walking to a rally hardly seems like the type of "exigent circumstance" the Supreme Court had in mind in crafting this doctrine. Consequently, the searches here are invalid for two reasons: they do not fall within any recognized exception to the warrant requirement, and they were not supported by probable cause, which is a requirement for most warrantless searches.

Our holding here does not leave police without any means of promoting public safety and detecting wrongdoing. First, if they have "reasonable suspicion" that anyone is carrying a weapon, they may conduct an ordinary Terry stop. If they have probable cause to believe anyone is carrying a weapon, they may either conduct a full-fledged exigent-circumstances search, see United States v. Banshee,

25

91 F.3d 99, 101 (11th Cir. 1996) ("[B]ased upon the inconsistent statements and the bulge in [the defendant's] mid-section, we find that [the officer] had probable cause to believe a search would uncover evidence of a crime. We also find that there were exigent circumstances excusing the need for a warrant." (citations omitted)), or arrest the individual and conduct a search incident to arrest, id. ("[T]he search could be considered a lawful search incident to an arrest. Specifically, we find that the bulge in [the defendant's] mid-section, coupled with the inconsistent statements, were sufficient grounds for [the officer] to conclude that [the defendant] was committing a crime."). Armed with these alternatives, the City cannot plausibly claim that it has no alternative but to accost innocent people who show no indication of possessing contraband or weapons. We therefore find that the mass, warrantless, suspicionless search policy violated the Fourth Amendment.

## III.

The City's search policy also violates the First Amendment in five ways. First, it is a burden on free speech and association imposed through the exercise of a government official's unbridled discretion; restrictions on First Amendment rights may not be left to an executive agent's uncabined judgment. Second, the searches were a form of prior restraint on speech and assembly; to participate in

26

the protest, individuals had to receive the prior permission of officers manning the checkpoints. Third, the search policy was implemented based on the content of the protestors' speech. Fourth, even assuming the searches were implemented exclusively for content-neutral reasons, they were impermissible because they did not constitute reasonable time, place, and manner limitations, which are the only permissible content-neutral burdens that may be placed upon free speech and association. Finally, even putting aside First Amendment analysis, the search policy constitutes an "unconstitutional condition;" protestors were required to surrender their Fourth Amendment rights (as discussed in Part II) in order to exercise their First Amendment rights. We explore each of these deficiencies in turn.

A.

The first crucial problem with the City's decision to search the protestors entering the SAW protest area is that it was not made according to any set, objective, neutral criteria. The Supreme Court has repeatedly held that burdens on First Amendment rights imposed by executive officials are invalid "in the absence of narrowly drawn, reasonable and definite standards for the officials to follow . . . . [A restriction is invalid when] [n]o standards appear anywhere; no narrowly drawn limitations; no circumscribing of this absolute power." Neimotko

27

v. Maryland, 340 U.S. 268, 271, 71 S. Ct. 325, 327, 95 L. Ed. 2d 267 (1951). Even if a particular restriction or condition is an otherwise permissible content-neutral regulation of the time, place, or manner of speech, it is unconstitutional if a government official has unbridled discretion to apply it. See Burk v. Augusta-Richmond County, 365 F.3d 1247, 1256 (11th Cir. 2004) ("Even a facially content-neutral time, place, and manner regulation may not vest public officials with unbridled discretion over permitting decisions.").

Although this doctrine originated with cases involving grants of power to executive officials to determine whether or not to grant licenses to engage in expression at all, see Lovell v. Griffin, 303 U.S. 444, 58 S. Ct. 666, 82 L. Ed. 2d 949 (1938) (invalidating an ordinance requiring individuals to obtain permits before circulating leaflets), it has subsequently been held to apply to a wider range of burdens on expression. For example, in Secretary of State of Maryland v. Joseph H. Munson, Co., 467 U.S. 947, 104 S. Ct. 2839, 81 L. Ed. 2d 786 (1984), the Supreme Court considered a local ordinance that permitted door-to-door solicitation for charitable causes, but empowered a local official to burden such speech by granting him complete discretion over whether to require a solicitor to certify that 75% or more of collected funds actually went to charitable purposes rather than administrative costs. One of the reasons (albeit not the primary one)

28

the Court invalidated the ordinance was that it "place[d] discretion in the hands of an official to grant or deny a license [based on the exemption]," thereby creating a "threat of censorship that by its very existence chills speech." Id. at 964 n.12, 104 S. Ct. at 2850 n.12. Similarly, in Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1988), the Supreme Court addressed an ordinance that permitted the distribution of newspapers, but empowered the Mayor to burden such expression by granting him complete discretion over whether newsstands could be used to aid the process. The Court invalidated the ordinance, holding, "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." Id. at 757, 108 S. Ct. at 2144.

Along these same lines, in Burk, we struck down an ordinance giving a county attorney unbridled discretion in determining whether speakers must indemnify the county against damages caused by their activities. 365 F.3d at 1256 ("We readily conclude that the indemnification provision in the . . . [o]rdinance fails to provide adequate standards [for the county attorney to follow]."); see also Saia v. New York, 334 U.S. 558, 68 S. Ct. 1148, 92 L. Ed. 1574 (1948) (invalidating an ordinance that permitted political communications, but gave an executive official unbridled discretion to burden them by deciding whether to

29

permit certain candidates to use loudspeakers).

In this case, the City's search policy unquestionably placed a burden on the speech and assembly rights of individuals wishing to participate in SAW's protest against the SOA. Protestors were inconvenienced by having to wait in line to be searched in order to enter the protest area. They were then subjected to a magnetometer, and possibly physical, search of their person and possessions. Those who refused to submit to magnetometer searches were prevented from speaking altogether.

The decision to implement this search policy was an exercise of the apparently unbridled discretion of Police Chief W.L. Dozier. The City does not provide us with any generally applicable state laws or local ordinances that set forth the circumstances under which individuals attending a large public gathering will be searched. The decision to implement searches instead appears to be left to the Chief's personal discretion, to be based on whatever factors he deems appropriate at any given point in time. The First Amendment does not permit the government to place burdens on speech and assembly in such an unprincipled, ad hoc manner.

The Chief contends that he decided to search the protestors because he felt there was probable cause to believe violence might erupt. SAW's unblemished

30

thirteen-year history of nonviolence at its protests forces us to question this self-serving claim. Even taking his explanation at face value, however, it entirely misses the point. The problem is not that the Chief applied an inappropriate standard in deciding whether to implement this search policy. Instead, the problem is that there were no objective, established standards for the Chief to utilize in making this decision other than those he happened to deem relevant. In this respect, this case is quite similar to Forsyth County v. Nationalist Movement, 505 U.S. 123, 112 S. Ct. 2395, 120 L. Ed. 2d 101 (1992), in which the Supreme Court invalidated an ordinance that permitted a county official to decide how much to charge for a permit to hold a public gathering. The Court noted,

> The decision how much to charge for police protection or administrative time—or even whether to charge at all—is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable.

Id. at 133, 112 S. Ct. at 2403. Because there are no established standards, nothing prevents the Chief from applying one standard to the SAW protest and an entirely different standard to other public gatherings (including those sponsored by organizations with which he might be more sympathetic). Cf. id. ("Nothing in the

law or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees.").

We emphasize that, in establishing such a general policy for determining the specific occasions on which mass searches may be implemented, legislatures or municipal governing bodies must establish specific criteria susceptible to judicial review. They may not simply craft ordinances permitting mass searches "when public safety so requires" or "when the Chief shall deem it advisable." Such general language does not meaningfully constrain the Chief's discretion. Instead, the ordinance must include specific, non-conclusory factors to guide these determinations. See Neimotko, 340 U.S. at 271, 71 S. Ct. at 327 (holding that when executive officials are given discretion in implementing restrictions on speech, there must be "narrowly drawn, reasonable and definite standards for the officials to follow"); see, e.g., Shuttlesworth v. Birmingham, 394 U.S. 147, 150, 89 S. Ct. 935, 938, 22 L. Ed. 2d 162 (1969) (holding that an ordinance directing public officials to grant licenses where the proposed expression is consistent with "public welfare, peace, safety, health, decency, good order, morals or convenience" is too amorphous meaningfully to cabin their discretion).

Even if this search would have been constitutional had it been conducted

under a general policy that appropriately limited the Chief's discretion,[16] the Chief's unilateral, unprincipled decision to implement the search outside the context of such a general policy would still have been improper. See Miami Herald Pub. Co. v. Hallandale, 734 F.2d 666, 674 (11th Cir. 1984) ("[I]n the unique context of first amendment challenges upon the facial validity of licensing statutes, it is the very existence of official discretion that gives rise to a threat of injury sufficient to warrant an injunction."). In the absence of objective criteria establishing when individuals attending large public gatherings may be searched, the ad hoc imposition of such a burden on free expression and assembly in this case must be invalidated.

## B.

Even putting aside the question of the Chief's unlimited discretion in deciding whether to require mass searches at the SAW protest, the searches are still unconstitutional because they constitute a prior restraint on free speech and assembly. "A prior restraint of expression exists when the government can deny access to a forum before the expression occurs." United States v. Frandsen, 212 F.3d 1231, 1236-37 (11th Cir. 2000). To enter SAW's protest site, individuals

---

[16] For the reasons discussed in the following Subparts, the searches in this case would still have been unconstitutional, even if the Chief's discretion in implementing the policy had been appropriately cabined.

33

must be waived through a checkpoint by a police officer. Officers are authorized to prevent people from assembling at the protest site and engaging in expression if they refuse to submit to a search or possess certain otherwise legal items that have been prohibited from the protest area. Because individuals must, in effect, receive the permission of police officers to enter the area of the protest and to exercise their rights to freedom of speech and assembly, the search policy establishes a prior restraint on protected expression. Cf. id. at 1237 ("Because the superintendent can deny the use of the park for expression by denying a permit, [the law at issue] is a prior restraint on expression.").

Because the searches constitute prior restraints, "there is a strong presumption against their constitutionality." Id. To be valid, a prior restraint must, at the very least, provide constitutionally adequate procedural safeguards for potential speakers. The policy here fails to provide such safeguards.

In Frandsen, we held, perhaps ambiguously, that under Supreme Court precedent, prior restraints must satisfy "at least some" of these requirements:

> (1) the burden of going to court to suppress the speech, and the burden of proof once in court, must rest with the government; (2) any restraint prior to a judicial determination may only be for a specified brief time period in order to preserve the status quo; and (3) an avenue for prompt judicial review of the censor's decision must be available.

34

Id. Meaningful judicial review is the touchstone of the test. "[P]rompt judicial review must be available to correct erroneous denials" of access to expression. Café Erotica of Fla., Inc. v. St. John's County, 360 F.3d 1274, 1283 (11th Cir. 2004). Here, however, there was no available route through which protestors excluded at the checkpoints from the protest site could seek meaningful judicial relief prior to the end of the protest. Furthermore, the City never availed itself of the courts in seeking initially to suppress the speech, nor did it limit its speech restraint for a "brief time period" pending judicial review. As a result, none of the Frandsen factors are satisfied, placing this prior restraint plainly outside of what is permissible under the First Amendment.

## C.

Even assuming the searches did not constitute a "prior restraint," they were still invalid. The Supreme Court has recognized two categories of restrictions on expression—content-based and content-neutral. The district court found that the decision to institute searches was content-neutral; that is, it was motivated by a legitimate governmental concern other than disagreement with the message conveyed. In support of this conclusion, the court offered only the following observation—"[T]he fact that everyone will be searched in the same manner

35

indicates that the restriction is content neutral." This is a non sequitur; the fact that all the protestors were searched does not suggest that the decision to search them was content-neutral; it suggests only that the City treated each SOA protestor equally <u>vis-a-vis</u> the other SOA protestors. The decision to search all the SOA protestors but not other persons or groups is entirely consistent with the notion that the City targeted them precisely because of the message they were sending.

Under the Supreme Court's holding in <u>Forsyth County v. Nationalist Movement</u>, the decision to institute the mass search policy was content-based. In <u>Nationalist Movement</u>, Forsyth County enacted a policy requiring individuals seeking permits for public gatherings to pay a fee to defray the cost of law enforcement and the county administrator's time in processing the permit. The county administrator was permitted to determine the amount of the fee, based on the amount of law enforcement assistance he anticipated would be necessary to maintain order. The Court observed:

> In order to assess accurately the cost of security for parade participants, the administrator must necessarily examine the content of the message that is conveyed, estimate the response of others to that content, and judge the number of police necessary to meet that response. The fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content. Those wishing to express views unpopular with bottle throwers, for

> example, may have to pay more for their permit. . . . . [I]t cannot be said that the fee's justification has nothing to do with content.

505 U.S. at 134, 112 S. Ct. at 2403 (quotation marks and citations omitted).

In this case, the Chief conducted a somewhat similar analysis in deciding to require magnetometer searches. Apparently anticipating how other organizations such as the Anarchists would react, the Chief infringed upon SAW's right to protest by requiring magnetometer searches. Under Nationalist Movement, when a government official decides that certain expressive activity will lead others to break the law, he is making a content-based distinction. Cf. R.A.V. v. City of St. Paul, 505 U.S. 377, 391-92, 112 S. Ct. 2538, 2547-48, 120 L. Ed. 2d 305 (1992) (striking down as content-based a local ordinance that banned only fighting words that targeted specific minority groups, even though such fighting words might well have produced the type of violence the city sought to prevent). Having concluded that the magnetometer searches are content-based, we must next determine whether the City's policy is a permissible content-based regulation of speech.

Content-based restrictions on speech in a public forum are subject to strict scrutiny, which means that we must "ascertain whether [the policy] employs the least restrictive means to meet a compelling government interest." Burk, 365 F.3d at 1255 (citing United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813,

37

120 S. Ct. 1878, 1886, 146 L. Ed. 2d 865 (2000)).[17] Neither side disputes that the protest takes place in a public forum, though none of the briefs indicate with any specificity the situs of the demonstrations. Bourgeois indicates only that the "large, non-violent demonstration and memorial procession [take place] outside the front gate of Fort Benning." Appellants' Brief at 2. It appears from uncontradicted testimony on the record, however, that the demonstrations take place on some combination of public roads and parks, the use of which SAW secured by permit. V2-R15-54. We assume it is this area to which Bourgeois refers in his brief. See Appellants' Brief at 23-24 ("[S]treets are natural and proper places for the dissemination of information [. . . .]" (quoting Schneider v. State, 308 U.S. 147, 163, 60 S. Ct. 146, 151, 84 L. Ed. 155 (1939) (quotation marks omitted))).[18] Thus, we proceed on the assumption that strict scrutiny

_____

[17] The City asserts that it need only establish a "significant" government interest to which its policy is narrowly tailored. Appellees' Brief at 38-39. This argument assumes, however, that the ordinance is a content-neutral regulation, which it is not. Although the City's brief describes as merely "significant" the government's purported interest in "maintain[ing] public safety, security, and order, which includes physical protection of demonstration participants, spectators, passers-by, and law enforcement," Appellees' Brief at 41 (quoting the district court), we take the City to be arguing that this interest is not just "significant," but "compelling." See Appellees' Brief at 38-39 ("[T]he actual test is whether Columbus had a 'significant' government interest. However, the evidence of record supports not only a 'significant' interest, but also supports a heightened finding of a 'compelling' interest.").

[18] We recognize that we determined in another case involving protests of the School of Americas that Fort Benning itself is a nonpublic forum. United States v. Corrigan, 144 F.3d 763, 767 (11th Cir. 1998). That case did not purport to rule on areas surrounding the Fort and thus does not bind us here. The City does not claim that its purpose in administering magnetometer searches is to burden speech only in the Fort itself, nor could it, for the policy is manifestly not

38

applies, and we begin by identifying the interest in the policy.

The asserted government interest here is in "maintain[ing] public safety, security, and order" for the protection of participants, law enforcement, and innocent bystanders. Appellees' Brief at 41. Here again the City asserts that the post-September 11 environment further substantiates the government's interest. Appellees' Brief at 41 ("First, there is a new and real threat of terrorist attack [that] did not exist previously. This threat is so authentic that the President . . . created the Department of Homeland Security. This Department has requested [that] local governments implement precautionary measures to assist in the prevention and detection of terrorist attack."). Although this argument was never before the district court, the City asserts that "this fact is one of which the Court can take judicial notice." Appellees' Brief at 41 n.15 (citing Fed. R. Evid. 201). The City then somewhat tautologically posits that magnetometer searches are narrowly tailored because they are the "least intrusive manner of removing the threat of knives, bombs, guns, and incendiary devices." Appellees' Brief at 43.

In fact, magnetometer searches do not seem narrowly tailored at all to the City's professed interest in maintaining safety. As discussed in Part II, there are other ways of ensuring public safety at this event, and the availability of

tailored to such a purpose.

39

alternatives casts serious doubt on any narrow tailoring analysis. See Carey v. Brown, 447 U.S. 455, 465, 100 S. Ct. 2286, 2292, 65 L. Ed. 2d 263 (1980) ("[C]ertain state interests may be so compelling that where no adequate alternatives exist a content-based distinction—if narrowly drawn—would be a permissible way of furthering those objectives . . . ." (citing Schenck v. United States, 249 U.S. 47, 39 S. Ct. 247, 63 L. Ed. 470 (1919))). Furthermore, the list the City provides of problems historically posed by the SAW protests includes a number of incidents against which magnetometer searches would provide little utility, suggesting underinclusivity. See Appellees' Brief at 42-43 (noting that affinity groups will attend the protest, but failing to indicate any proclivities of such groups to bring metallic objects to protests; that each year violence and illegal activity has occurred, but failing to indicate that even a single instance of such activity involved the use of a metallic object; that a large crowd will be in attendance, but failing to show any meaningful relationship between the size of a crowd and the likelihood that anyone would carry metallic objects to such a crowd; that the 2001 protest included an effort to "gather[] items and [an] attempt[] to ignite a large fire," but failing to explain how a metal detector could prevent flammable (and therefore presumably nonmetallic) items from being brought into the protest; and that attendees once brought feces and blood to the

40

protest, but failing to show that a magnetometer could detect these "weapons"). In addition, it does not strain belief to imagine that a magnetometer search could be triggered by a number of objects that have no combative or militaristic utility. In any event, the magnetometer searches are, at a minimum, substantially underinclusive to meet the government's purported interest in public safety.

The City's policy is underinclusive along another dimension as well. Bourgeois points out that the magnetometer search policy has not been implemented for any other large gatherings the City has faced. In particular, sporting events—at which large crowds gather; where authorities have no way of knowing who is coming; at which "affinity groups" of various sorts are regularly in attendance; where "violent acts had <u>in fact</u> occurred," <u>Appellants' Brief</u> at 33; and which confine large numbers of people into a compact area (presumably even more so than a protest in a public park)—would seem to implicate the government's purported interest even more gravely than the SAW protests. Thus, the City's apparently arbitrary application of its magnetometer search policy from one type of event to the next underscores both our "unbridled discretion" concerns outlined above and our doubts here about whether the policy is narrowly tailored to any kind of government interest, whether compelling or even simply "significant."

Because we hold that the policy here is not narrowly tailored to serve the government's interest, we need not address the question whether the interest is compelling. It bears mentioning here, however, that the City's attempt to employ terrorism to bolster its alleged interest in the search policy, without having developed a record at the district court level indicating that concerns about terrorism motivated the adoption of that policy, is unavailing. The City asks us to take "judicial notice" that the Department of Homeland Security has asked local governments to "implement precautionary measures" to sniff out terrorist threats. Appellees' Brief at 41 & n.15. The question, however, is not whether we may or may not take notice; it is whether the City actually took this directive into consideration when drafting its policy. Otherwise, the City merely invites us to engage in post hoc rationalizations of its policy, which is precisely one of the dangers that attaches to the sort of uncabined, impulsive policymaking practice at issue in this case. Cf. Plain Dealer, 486 U.S. at 758, 108 S. Ct. at 2144 ("Without . . . guideposts, post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression."). The fact that the City cannot even decide from one stage of litigation to the next what precisely was the basis for its decision

42

to search protestors precludes a determination that the policy was in any way "narrowly tailored." Thus, the policy here is an impermissible content-based regulation of speech.

D.

Even if we were to accept that the searches were entirely motivated by content-neutral concerns, they still violate the First Amendment. Content-neutral restrictions are permissible so long as they amount to "reasonable time, place, and manner restrictions" on speech. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S. Ct. 3065, 3069, 82 L. Ed. 2d 221 (1984) ("Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. . . . [R]estrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech."). Because these searches were not a form of "time, place, or manner restriction," they were an impermissible burden on the protestors' First Amendment rights.

Here, the City contends that the search was a permissible restriction on the manner of the protest. The City might be correct to suppose that a mere ban on the use of weapons or incendiary devices at the protest would withstand a "reasonable manner restriction" analysis. Examples of "manner" restrictions that have been upheld by the Supreme Court include bans on certain types of amplification

equipment or requirements that speakers do not exceed a particular volume. Ward v. Rock Against Racism, 491 U.S. 781, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989) (upholding restrictions on the volume of a concert in a public bandshell), Kovacs v. Cooper, 336 U.S. 77, 69 S. Ct. 448, 453, 93 L. Ed. 513 (1949) ("We think it is a permissible exercise of legislative discretion to bar sound trucks with broadcasts of public interest, amplified to a loud and raucous volume, from the public ways of municipalities.").

Simply identifying a manner of speech that legitimately may be restricted is not the end of the matter, however. We have said that any restriction must be "reasonable," meaning "not the anemic simulacrum of a constraint on governmental power found in the Due Process Clause's 'rational basis' test, but rather a more robust notion of 'reasonableness' such as that applied in the Fourth Amendment context." Holloman ex rel Holloman v. Harland, 370 F.3d 1252, 1271 (11th Cir. 2004) (citations omitted). Specifically, a reasonable restriction on a manner of speech "must leave open alternative channels of communication and . . . not restrict substantially more speech than necessary to further a legitimate government interest." Burk, 365 F.3d at 1251.

An antecedent mass search for weapons or incendiary devices goes far beyond merely regulating the manner in which the protest is conducted. Such a

search is, instead, a prophylactic measure designed to implement and enforce an otherwise permissible "manner" restriction and is conceptually distinct from the underlying restriction itself. Under the City's policy, every person who wishes to speak by taking part in the SAW protest is burdened by a magnetometer search. The scope of this far-reaching policy alone would pose difficult First Amendment problems without the additional fact that, as noted above, the magnetometer searches will fail to catch a number of additional dangers that implicate the City's alleged interest. Because the search policy thus "restrict[s] substantially more speech than necessary to further a legitimate government interest," id., it is impermissible.

## E.

The City may contend that the searches are permissible because they are entirely voluntary. No protestors are compelled to submit to searches; they must do so only if they choose to participate in the protest against the SOA. This is a classic "unconstitutional condition," in which the government conditions receipt of a benefit or privilege on the relinquishment of a constitutional right. See Adams v. James, 784 F.2d 1077, 1080 (11th Cir. 1986) ("The doctrine of unconstitutional conditions prohibits terminating benefits, though not classified as entitlements, if the termination is based on motivations that other constitutional

45

provisions proscribe."). This case presents an especially malignant unconstitutional condition because citizens are being required to surrender a constitutional right—freedom from unreasonable searches and seizures—not merely to receive a discretionary benefit but to exercise two other fundamental rights—freedom of speech and assembly.

Our circuit has roundly condemned the use of unconstitutional conditions. See, e.g., Bertrand v. United States, 467 F.2d 901, 902 (5th Cir. 1972) (ordering resentencing due to the trial judge's questioning of the defendant because "[t]he effect of the trial judge's questioning was to impose an unconstitutional condition on the petitioner's Fifth Amendment rights: he could go into the details of the other offense . . . that might constitute a confession or he could exercise his right to be silent and receive a long sentence");[19] Boykins v. Fairfield, 370 F.2d 847, 851 (5th Cir. 1967) ("Even if the school board were under no obligation to provide public education to children of military personnel on the air base, it could not provide that education subject to an unconstitutional condition."). We are especially careful to ensure that the government does not use unconstitutional conditions to chill speech. See, e.g., Leary v. United States, 431 F.2d 85, 89 (5th

---

[19] In Bonner v. Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Cir. 1970) ("[I]f the appellant's eligibility to be enlarged on bail under the Eighth Amendment may be lost because he exercises his first amendment right to freedom of speech and to freedom of the press, then [the law at issue] imposes an unconstitutional condition.").

The ability of protestors to avoid the searches by declining to participate in the protest does not alleviate the constitutional infirmity of the City's search policy; indeed, the very purpose of the unconstitutional conditions doctrine is to prevent the Government from subtly pressuring citizens, whether purposely or inadvertently, into surrendering their rights. Similarly, the existence of other vehicles through which protestors could voice their disagreement with the SOA (e.g., letters to Congress) does not in any way alleviate the unconstitutional conditions problem. "The applicability of the unconstitutional conditions doctrine does not turn on whether conferral of the discretionary benefit is conditioned upon completely foregoing the right to engage in expression or instead upon foregoing the right to engage in that expression in certain places or manners or at certain times." Sammy's, Ltd. v. City of Mobile, 140 F.3d 993, 1000 n.2 (11th Cir. 1998). The one situation in which the doctrine applies with slightly reduced force, public employment, is inapplicable here. See Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 1734, 20 L. Ed. 2d 811 (1968) ("[T]he State has interests as

47

an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.").

As discussed in Part II, the searches violated the Fourth Amendment. The speech and assembly in which the protestors sought to engage were unquestionably protected by the First Amendment. Consequently, the City's decision to require protestors to waive their Fourth Amendment rights and submit to searches in order to exercise their First Amendment rights was an unconstitutional condition that violated the First Amendment.

IV.

The City's search policy violated both the First and Fourth Amendments to the United States Constitution. The plaintiffs are entitled to a permanent injunction against its implementation. The judgment of the district court is VACATED and the case is REMANDED for the entry of appropriate injunctive relief.

SO ORDERED.