767 So.2d 470 (2000)
STATE of Florida, Appellant,
v.
Gabriel David IACCARINO, Appellee.
State of Florida, Appellant,
v.
Cambrian John Karnes, Appellee.
State of Florida, Appellant,
v.
Judith Gattorno, Appellee.
State of Florida, Appellant,
v.
Ga Ria Wang, Appellee.
State of Florida, Appellant,
v.
James Prendergast, Appellee.
State of Florida, Appellant,
v.
James Tevis, Appellee.
State of Florida, Appellant,
v.
Troy Edward Wilson, Appellee.
State of Florida, Appellant,
v.
Anthony DiFranco, Appellee.
State of Florida, Appellant,
v.
Brian Ankner, Appellee.
State of Florida, Appellant,
v.
Brian Font, Appellee.
State of Florida, Appellant,
v.
Roel Cirilo, Appellee.
State of Florida, Appellant,
v.
Anthony Grant Bush, Appellee.
State of Florida, Appellant,
v.
Thomas Dean, Appellee.
Nos. 2D99-941, 2D99-946, 2D99-956 to 2D99-961, 2D99-964, 2D99-966, 2D99-967, 2D99-1086 and 2D99-1101.
District Court of Appeal of Florida, Second District.
April 12, 2000.
*472 Robert A. Butterworth, Attorney General, Tallahassee, and Wendy Buffington, Assistant Attorney General, Tampa, for Appellant.
Daniel J. Fernandez of Fernandez & Benito, P.A., Tampa, for Appellee Gabriel David Iaccarino.
Randall C. Grantham of Randall C. Grantham, P.A., Lutz, for Appellees Cambrian John Karnes, Ga Ria Wang, James Prendergast, and Brian Ankner.
James Marion Moorman, Public Defender, and Cynthia J. Dodge, Assistant Public Defender, Bartow, for Appellees Judith Gattorno, James Tevis, Anthony DiFranco, Brian Font, and Thomas Dean.
Larry Sandefer of Larry Sandefer, P.A., Clearwater, for Appellee Troy Edward Wilson.
Arthur S. Corrales, Tampa, for Appellee Roel Cirilo.
Robert W. Attridge, Jr., of the Law Offices of Robert W. Attridge, Jr., P.A., New Port Richey, for Appellee Anthony Grant Bush.
PER CURIAM.
The State of Florida appeals from the trial court's orders which granted the motions to suppress drug contraband found on Brian Ankner, Anthony Grant Bush, Roel Cirilo, Thomas Dean, Anthony Di-Franco, Brian Font, Judith Gattorno, Gabriel David Iaccarino, Cambrian John Karnes, James Prendergast, James Tevis, Ga Ria Wang, and Troy Edward Wilson (the Appellees).[1] The searches and seizures were conducted by Pasco County deputies and corrections officers near the entry gate at a music festival. Because we find that the searches and seizures were unlawful, we affirm.
This festival, also known as Zenfest, was the fourth multi-cultural event produced by Zenfest, Inc. (the promoter) on 30 acres of open land with almost 177 acres for parking. Over 15,000 patrons purchased *473 tickets and attended Zenfest, which lasted for twenty-two hours, starting at 3:00 p.m. on September 5, 1998. Many patrons traveled for several hours to attend the festival.
In the preliminary stages of planning Zenfest, there were numerous meetings between the promoter, the property owner, and sheriff's officials. The property owner, who had permitted eight previous music festivals on his property, had three major conditions. First, he wanted to prohibit bottles, cans, and other possible projectiles on the property for fear of injuries to entertainers on the stage. Second, he wanted to prohibit drugs, mainly because they decreased his beer sales; and third, he demanded the sheriff's office as the lead security agency.
It became apparent to the property owner and the promoter that input from the sheriff's office would be important to the county commission in determining whether a permit would be issued approving Zenfest. The end result was that a zero-tolerance drug policy evolved from numerous meetings. As part of the permit conditions, the promoter was required to aggressively advertise this zero-tolerance drug policy. The promoter subsequently published 250,000 anti-drug brochures which stated that drugs should not be brought to the event and that, if drug use occurred, there would be no future concerts. The promoter agreed to post six professionally-painted signs at the automobile and patron entrances. The promoter was also required to pay 100 sheriff's office command personnel, deputies, and correctional officers to provide security and conduct searches at Zenfest. In addition, the promoter paid eighty private security personnel, called "Black Shirts" because of their attire, to walk the grounds. The promoter assumed that the festival patrons would be subject to random pat-down searches and possible metal detector checks to discover drugs, and he was aware that at other concerts security threw away any illegal drugs found during searches without arresting patrons.
The sheriff's office posted a sign-up sheet for deputies who were not on duty and wished to work the event. The Zenfest assignment was an "extra-duty" assignment in which the sheriff's office resources could be used. The promoter hired and paid the salaries of the officers for their work. Although the property owner provided the officers with a written job description of their duties, the sheriff's office had discretion as to where to assign officers.
At the start of Zenfest, the number and content of the professionally-made signs to which the promoter, property owner, and sheriff's officials had agreed, did not materialize. Instead, there were two rapidly produced, hand-lettered signs on poster board for the parking area which stated: "No One Admitted Under 18. No Drugs. Subject To Complete Body Search Upon Entry. No Containers Allowed In Music Area." These signs were placed on the traffic control horses the patrons would have to walk past to enter the gate. However, there was no evidence to show how long these signs were legible in light of the constant rain over the two days of the festival.
Two professional signs were subsequently produced and placed at eye level on each side of the patron entrance. These signs stated:
No Cans, Bottles, Coolers, Back Packs, Etc. Allowed. No One Under 18 Will Be Admitted. Patrons Will Be Subject to Search. No Alcoholic Beverages Allowed. Possession Of Illegal Drugs Will Result In Arrest.
No arrangements were made to illuminate any of the four signs after dark, although the patron entrance was lit by a 300-amp sentinel.
The patron entrance, an opening in a six-foot chain-link fence, was wide enough to permit eight lines of patrons to enter the opening at once, though only three *474 lines were used. Tickets were collected before the patrons were permitted to go through the opening. Several Black Shirts walked around the entrance, yelling intermittent warnings to the patrons regarding the impending searches. A sheriff's office helicopter flew overhead and the sheriff's office set up a paddy wagon at the front gate for arrests. In the parking lot were several police cruisers which the officers used to transport themselves to the festival.
Immediately inside the opening were three stations at which thirty to forty uniformed deputies or correctional officers either stopped and searched patrons or motioned them through without a search. The officers were not given any guidelines as to how to conduct the searches; the extent of the searches was left entirely up to them. The correction officers tended to conduct a search equivalent to booking a person into the jail, requiring patrons to take off caps, remove shoes and socks, empty pockets, open their purses, and display the contents of their wallets. The officers also subjected many patrons to pat-down searches. The promoter testified that he voiced objections to the type of searches he observed being conducted by these officers, but that sheriff's command officers told him there was nothing that could be done. The promoter also testified that he would have given refunds to those who refused to be searched, although no such refunds were given. Some of the officers testified that they thought patrons could obtain a complete refund upon refusal to be searched; however, the police captain testified that he knew of no such policy and did not inform the officers of such. There were a total of forty-three arrests for possession of drug contraband.
Appellee Ankner testified that he was pulled over to a station by an officer who frisked Ankner's body, including his crotch and genitals. The officer directed Ankner to empty his pockets and found cocaine and marijuana in Ankner's cigarette pack. During a search of Bush, an officer located six pills containing methylene dioxy methamphetamine (MDMA) in a cigarette pack. Cirilo was directed to empty his pockets, resulting in the discovery of pills containing MDMA. Dean was also directed to empty his pockets and, although he affirmatively indicated that he did not want his wallet searched, an officer searched his wallet and found lysergic acid diethylamide (LSD). DiFranco's wallet was also searched, and cocaine was seized. An officer asked Font to submit to a search, which the officer subsequently conducted even though Font gave no verbal consent. A search of Font's wallet revealed LSD. Gattorno was subjected to a pat-down search and told to pull on the bottom of her bra twice. After the second pull, a packet of MDMA fell out. An officer patted down Iaccarino and told him to empty his pockets and found MDMA. Karnes was told to empty his pockets and two pills of MDMA were seized from his wallet. After directing Prendergast to empty his pockets, an officer located MDMA in his wallet. Tevis was searched, and a zip-lock baggie inside his wallet containing LSD and one marijuana cigarette was seized. A search of Wang produced one pill containing MDMA from Wang's wallet. After Wilson was directed to empty his pockets, an officer seized LSD.
All of the Appellees testified that they never saw any of the four signs. Only Font testified that he was requested to submit to a search. None of the Appellees testified that they affirmatively consented to the searches. Dean is the only defendant who, by affirmative action, attempted to withdraw consent to search his wallet.[2]
The State sets forth two issues in support of reversal. The first issue is whether the officers who conducted the searches were acting as instruments of the state. The State's position is that the officers were serving only as employees of a private *475 contractor for the promoter and, therefore, no Fourth Amendment issues of illegal searches are present. However, we conclude that the officers in this case were not serving in such a capacity.
The Fourth Amendment to the United States Constitution and Article I, section 12 of the Florida Constitution guarantee the right to be free from "unreasonable searches and seizures...." Implicit in that guarantee is the requirement that an agent of the government perform those searches and seizures. See Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); Bernovich v. State, 272 So.2d 505, 507 (Fla.1973). The test for determining whether private individuals are agents of the government is whether, in consideration of the circumstances, the individuals acted as instruments of the state. See Coolidge v. New Hampshire, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). To determine whether a private individual acts as an instrument of the state, courts look to (1) whether the government was aware of and acquiesced in the conduct; and (2) whether the individual intended to assist the police or further his own ends. See United States v. Cleaveland, 38 F.3d 1092, 1093 (9th Cir.1994). This standard also applies to the actions of off-duty police officers. See United States v. McGreevy, 652 F.2d 849, 850 (9th Cir.1981); Traver v. Meshriy, 627 F.2d 934 (9th Cir.1980).
In McGreevy, the Ninth Circuit concluded that an off-duty police officer who was working for Federal Express was not acting as an instrument of the state when he opened a package and found contraband. See 652 F.2d at 851. "[The off-duty police officer] did not hold his Federal Express position because he was a police officer. He carefully separated the two jobs. He knew of no understanding between Federal Express and the DEA for the disposal of contraband." Id. The court contrasted the case with Traver, in which it held that an off-duty police officer who was working as a "security-teller" in a bank was acting as an instrument of the state when he detained a customer. That police officer's off-duty employment was part of the police department's "secondary hiring program," wherein the police department selected the officers and the police officer's first duty was to the department, not the bank. Id. See also State v. Carter, 267 N.W.2d 385, 386 (Iowa 1978) (holding that off-duty police officers who conducted a search were not private individuals because "[t]he men were police officers, they were in uniform, they carried sidearms. The record shows arrests were made by these guards as Des Moines police officers. Most significant of all, the whole arrangement was effected in cooperation with the Des Moines Police Department."); State v. Robinson, 379 So.2d 712, 713 (Fla. 5th DCA 1980) (holding that an off-duty police officer who worked security at Jai Alai was an instrument of the state when the officer was wearing full police uniform and the employment had been approved by the police department).
In this case, the Appellees presented ample evidence that the government acquiesced in the officers' conduct. The promoter enlisted input from and followed the suggestions of the sheriff's office in applying for a permit to the county commission. The promoter hired the officers to conduct the searches as an "extra-duty" assignment, which was coordinated by the sheriff's office and permitted the use of sheriff's office resources. Although the property owner provided the officers with a written job description of their duties, the sheriff's office also had discretion as to where to assign officers. Furthermore, the officers conducted the searches in full uniform, including firearms, and several drove police cruisers to the festival. The officers also had complete discretion as to how thorough a search to conduct. When the promoter voiced objection to the type of searches being conducted by these officers, sheriff's command officers informed him that nothing could be done.
*476 It is clear from this evidence that the government acquiesced in the officers' conduct by coordinating the extra-duty assignments. It is also clear that the officers' first priority was to the sheriff's office, as opposed to furthering their own needs. The sheriff's office had even placed a paddy wagon in front of the patron entrance in contemplation of the impending arrests. Therefore, although the officers were off-duty, they acted as instruments of the state for purposes of Fourth Amendment analysis.
The second issue raised by the State is whether the Appellees consented to these searches. Warrantless searches conducted by instruments of the state are per se unreasonable unless the searches fall within one of a few specifically-established and well-delineated exceptions. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The only exception possibly applicable in this case is a consent to search.[3] When the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. See Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Whether consent was freely and voluntarily given is a factual question to be determined by the totality of the circumstances. See Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Furthermore, there are limits to the consent an individual provides to an instrument of the state. See Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonablenesswhat would the typical reasonable person have understood by the exchange between the officer and the suspect?").
In this case, the trial court found that none of the Appellees expressly consented to the searches and that none of the officers requested consent.[4] We agree that there is no evidence to support that any of the Appellees expressly consented to a search. Therefore, this review must be based upon whether the Appellees impliedly consented to the searches. Some factors the courts have considered in determining the issue of implied consent include: (1) whether the defendant was aware that his conduct would subject him to a search, see McGann v. Northeast Ill. Reg'l Commuter R.R. Corp., 8 F.3d 1174, 1181 (7th Cir.1993) (en banc); (2) whether the search was supported by a "vital interest," id.; (3) whether the searching officer had apparent authority to search and arrest, see Wheaton v. Hagan, 435 F.Supp. 1134, 1147 (M.D.N.C.1977); (4) whether the defendant was advised of his right to refuse, id.; see also Gaioni v. Folmar, 460 F.Supp. 10, 15 (M.D.Ala. 1978); and (5) whether refusal would result in a deprivation of a benefit or right, id. See generally Gaioni, 460 F.Supp. at 14-15.
Regarding the first consent factor (whether the defendant was aware that his conduct would subject him to a search), we conclude that we must disregard the hand-lettered signs because there is no testimony regarding the condition in which they survived the rain. We must decide whether the two professional signs located at each side of the festival patron entrance, in addition to other activities at the gate, put *477 the Appellees on notice that their conduct would subject them to searches.
In State v. Carter, the Supreme Court of Iowa held that defendants did not impliedly consent to searches conducted as they entered an auditorium to attend a rock concert. See 267 N.W.2d at 387. In that case, the auditorium management had posted two signs in the lobby warning that those who took illegal substances or alcohol into the auditorium would be prosecuted. Id. at 385. Management also broadcasted a fifteen-second taped message which stated the same warning. In the lobby, uniformed police officers attempted to search everyone, but admitted that some patrons got by without being searched. The defendant denied reading the signs or hearing the taped warning, but admitted to seeing a guard search a woman's purse. The officers did not ask the defendant whether they could search him.
In declining to find implied consent, the supreme court in Carter reasoned that the signs and taped warning were ambiguous as they did not inform the attendees they would be personally searched. Id. at 387. The court also found that the fact that the defendant saw a woman's purse being searched would not necessarily alert him to the fact that his person would be searched. Because there was evidence that the defendant did not read the signs or hear the taped message, the court concluded that he could not have given free and voluntary consent to the search. Id.
Under similar facts, the Southern District of Iowa refused to find implied consent for searches conducted at a rock concert, reasoning:
[T]his Court cannot conclude that plaintiffs voluntarily submitted to a search of their person and personal effects. Individual patrons are not forewarned of the possible search until entering the Auditorium, and even then the warnings, a sign and a tape recording in a crowded and noisy lobby, are inadequate. The sign says nothing of a search, the tape indicates a "check" but nothing of confiscation of contraband, and neither informs patrons of their right to refuse search and have their tickets refunded. Having purchased tickets, and in some instances having already presented them to an usher at the turnstiles, a random number of patrons are suddenly confronted by armed uniform police officers and told that their admission to the concert is conditioned upon their submission to a physical search of their person and personal effects ... Under the circumstances, which are marked by coercion and duress, the Court cannot possibly conclude that any ensuing consent was of a voluntary nature.
Stroeber v. Commission Veteran's Auditorium, 453 F.Supp. 926, 933 (S.D.Iowa 1977). Under the circumstances in this case, we conclude that the Appellees were not aware that their conduct would subject them to searches. A reasonable person would conclude from the signs posted at the gate that the search was limited to cans, bottles, and the contents of coolers or backpacks, which were to be kept out of the festival grounds. At most, the patrons could expect a pat-down frisk of their clothing to discover cans or bottles hidden in their clothing. No reasonable person would conclude that the signs permitted the officers to search wallets, pockets, and underwear.
The State argues that the signs notified patrons that they would be arrested if illegal drugs were found on them. However, as the promoter testified, at some music festivals drug contraband, if seized, is thrown away without involving law enforcement. Therefore, a sign stating that "[p]atrons will be subject to search" and "[p]ossession of illegal drugs will result in arrest" does not necessarily lead to a conclusion that each patron is consenting to a search by law enforcement.
Furthermore, it cannot be said that the patrons even saw the posted signs. There was no testimony regarding how long the *478 two handwritten signs at the automobile entry remained posted and what effect the rain had on those signs. While there were two professionally-lettered signs at the gate, the signs were not illuminated, so it is not clear whether they could be seen after dark. Furthermore, the opening in the gate was wide enough to permit eight lines of patrons entering at once. With a crowd that supported a total attendance of 15,000, two posted signs of the type utilized could remain unseen by patrons.
Similarly, the warnings some of the Black Shirts testified that they yelled to the patrons would not lead a reasonable person to conclude that they would be subjected to searches of the type that occurred. These alleged warnings were general statements to the effect that patrons should get rid of any drugs that they were carrying. Additionally, all of the Appellees testified that they did not hear any such warnings. The same rationale supports a finding that the anti-drug brochures did not put the Appellees on notice that they would be subject to a search of the extent conducted in this case.
As to the second consent factor (whether the search was supported by a "vital interest"), we conclude that the searches were not supported by a "vital interest" which would justify the degree of intrusiveness. Although courts have routinely upheld searches conducted at airports and courthouses, searches at music concerts and festivals are treated differently. See Gaioni, 460 F.Supp. at 13-14 (noting that courts have carved an exception to the warrant requirement of the Fourth Amendment for airport and courthouse searches which obviates the need for considering consent in those cases); Collier v. Miller, 414 F.Supp. 1357 (S.D.Tex. 1976); Nakamoto v. Fasi, 64 Haw. 17, 635 P.2d 946 (1981). These searches are justifiable due to the underlying vital safety interests. See also McGann, 8 F.3d at 1181; Gaioni, 460 F.Supp. at 13 (such interests include the potential for violence in a hijacking or airplane bombing).
In this case, the property owner testified that his interest in prohibiting cans, bottles, coolers, and backpacks was in protecting the performers from those objects when used as projectiles. The property owner's primary concern for prohibiting drugs was the impact on beer sales. The State argues that the "vital interest" supporting the searches in this case was the illegality of the drugs themselves.
We agree that the interest in protecting the performers from projectiles is a "vital interest" that would justify a search for those items which could be used as projectiles. However, we do not find that the interests which support the searches for drugs rise to the level of "vital interests." If this court permitted the illegality of the substances themselves to rise to the level of "vital interests," then a similar sign posting would justify any search of any person at any time and to any degree. For example, such a "vital interest" could seemingly justify a search at a high school football game, where each student, teacher, and parent could be directed to take off shoes and socks, pull out their bras, empty their pockets and the contents of wallets, and have their crotch and genitals frisked.
Additionally, airport and courthouse searches can be distinguished from searches at entertainment events because of the effectiveness of the searches and their degree of intrusion. See Gaioni, 460 F.Supp. at 14. In Gaioni, the Middle District of Alabama rejected the defendant's argument that the court should create a warrant exception for searches at rock concerts. See 460 F.Supp. at 13-14. In addition to the interests served by the searches, the court distinguished airport searches based on their effectiveness, and the degree of intrusion entailed:
The evidence reflects that the [rock concert] searches were very intrusive and not very effective. Although defendants did seize some contraband, drug and alcohol use at the [rock concert] was not eliminated. Airport searches, on the *479 other hand, are highly effective. They usually are conducted with magnometers [sic], which detect the "overwhelming majority" of items searched for, and, consequently, have caused a dramatic decline in the number of hijackings and bombings. In addition, airport searches involve minimal invasion of privacy.
Id. (citations omitted). See also Jacobsen v. City of Seattle, 98 Wash.2d 668, 658 P.2d 653, 656 (1983) (en banc) ("[T]he situations at a rock concert are not comparable to the dangers posed at airports and courthouses.... [B]oth airport searches which are conducted with a magnetometer and courtroom searches which employ a brief stop and a visual examination of packages, pocketbooks, and briefcases are far less intrusive.").
The effectiveness of the searches in this case is, at best, questionable. Although there was no testimony regarding whether any performers were injured during Zenfest, it would be easy to determine the effectiveness of prohibiting items that could be used as projectiles on stage. However, the amount of drugs found on the Appellees would not necessarily result in conduct that could be detected.
In these cases, the degree of intrusion was severe. The corrections officers tended to conduct a search as if booking a person into jail, requiring patrons to take off caps, remove shoes and socks, empty pockets, open their purses, and display the contents of their wallets. Many patrons were also subjected to a pat-down search. Appellee Ankner testified that his crotch and groin were touched, and Gattorno was directed twice to pull on her bra. All of the Appellees had the contents of their pockets thoroughly searched.
Turning to the third consent factor (whether the searching officer had apparent authority to search and arrest), it is clear from the testimony of the promoter and sheriff's officials that the officers were given complete discretion as to how intrusive a search to conduct. The Black Shirts directed the patrons to between thirty and forty uniformed, armed officers after entering the gate. The officers patted some down and ordered others to empty their pockets and shake out their blouses. When some of the Appellees pulled out their wallets, the officers grabbed the wallets and searched inside. Only one Appellee testified that a searching officer requested permission to search him. Although none of the Appellees testified that the officers threatened them, we conclude that the atmosphere at the gate was intimidating. It is clear from these facts that the officers who conducted the searches at the gate possessed apparent authority to not only search the patrons, but to arrest them. See Gaioni, 460 F.Supp. at 14 (considering the presence of "a large force of police officers, armed and in uniform, which possessed apparent authority to conduct the searches" in determining whether the defendants impliedly consented to searches).
As to the fourth consent factor (whether the defendant was advised of his right to refuse), none of the officers told the Appellees of their right to refuse to be searched. Furthermore, there were no signs posted informing the patrons of this right. While the promoter testified that he would have given those persons who refused to be searched refunds, there is no evidence that anyone received such a refund. Although some of the officers thought the patrons could obtain a refund if they refused to be searched, the police captain testified that he did not inform the officers of this right. The same facts support a finding under the fifth consent factor (whether refusal would result in a deprivation of a benefit or right) that a failure to acquiesce in a search would result in a deprivation of a patron's right to attend the concert, if not their ticket cost as well.
Considering the aforementioned factors and applying them to the evidence before this court, it is clear that the circumstances surrounding the searches at Zenfest *480 do not give rise to a finding of implied consent. Accordingly, we affirm the trial court's order granting the Appellees' motions to suppress. However, we do not wish to trivialize the problem faced by those involved with concerts such as Zenfest. It is clear from events such as the most recent Woodstock concert that such concerts have the potential to result in serious crowd control problems. Several other courts have recognized the problems involved in these types of events and suggested policies which might alleviate the problems without infringing on the Fourth Amendment rights of the patrons. We approve of the following alternatives suggested by the Middle District of North Carolina:
Without seeking to define exactly what type of policy will pass constitutional muster, in part because that cannot be determined until the method by which the policy is actually put into practice is known, there are several alternatives readily apparent. All parcels, bundles, and pocketbooks over a certain size could be banned from the Coliseum grounds, with appropriate notices to that effect placed on tickets and signs. Some form of check rooms as those used by museums and other large public buildings could be provided for parcels and other objects, with a fee charged that would cover the cost of operation of such facilities. If random searches are still deemed necessary after other efforts have failed, they would be less objectionable if genuinely voluntary consent could be established. This might be achieved by having officers at the turnstiles dressed in civilian clothes and by notifying patrons that they must either take their parcels, pocketbooks, or whatever is causing the bulges in their pockets out to their cars or else be subject to a search.
Wheaton, 435 F.Supp. at 1148. See also Jacobsen, 658 P.2d at 657; Nakamoto, 635 P.2d at 953; Jensen v. City of Pontiac, 113 Mich.App. 341, 317 N.W.2d 619, 624 (1982).
Affirmed.
PATTERSON, C.J., and PARKER and SALCINES, JJ., Concur.
NOTES
[1] The State also appealed from the order granting a motion to suppress drug contraband found on David Urbancik. However, the State has voluntarily dismissed that appeal due to Urbancik's recent death.
[2] Because we find that the Appellees did not consent to the searches in this case, we do not reach the issue of whether Dean effectively withdrew his consent during his search.
[3] The State does not assert on appeal that this court should carve out an exception to the warrant requirement for searches conducted at music concerts. Therefore, we do not address that specific issue, although we note that some of the same considerations we apply to the consent issue would seemingly support a refusal to carve out such an exception.
[4] We note that the trial court's finding that none of the officers requested consent is contradicted by Appellee Font's testimony that the officer who searched him requested his consent. Accordingly, this finding is not supported by competent, substantial evidence.