[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-14666

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 26, 2007
THOMAS K. KAHN
CLERK

D.C. Docket No. 05-02191-CV-T-27-MAP

GORDON JOHNSTON,

Plaintiff-Appellee,

versus

TAMPA SPORTS AUTHORITY,
HENRY G. SAAVEDRA, in his Official
Capacity as Executive Director of the
Tampa Sports Authority,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(June 26, 2007)**

Before BIRCH and FAY, Circuit Judges and DUFFEY,* District Judge

PER CURIAM:

_____
        *Honorable William S. Duffey, Jr., United States District Judge for the Northern District
of Georgia, sitting by designation.

The issue before the Court is whether the district court erred when it refused to reconsider a state court's order enjoining Appellant Tampa Sports Authority's (the "Authority") policy of conducting pat-down searches of all ticket holders seeking to attend Tampa Bay Buccaneers (the "Buccaneers") games at the Raymond James Stadium in Tampa, Florida (the "Stadium"). We conclude that Johnston consented to the searches. The district court thus erred in not reconsidering the preliminary injunction. Accordingly, we reverse and remand to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

In February 2005, the Authority instituted a policy requiring brief pat-down searches of all persons attending Buccaneers football games. Johnston is a Buccaneers season ticket subscriber who first became a season ticker holder in 2001, and he has renewed his season tickets each year since 2001. The season ticket is, on its face, a revocable license for entry to the Stadium to attend Buccaneers games. The Stadium is operated by the Authority, a Florida public entity. The Authority grants the Buccaneers use of the Stadium pursuant to a Stadium Agreement (the "Agreement"). The Agreement provides that the Authority remains responsible for stadium security during Buccaneers games, and obligates the Authority to "make proper rules and regulations for use of the

Stadium . . . . [T]he content of such rules and regulations shall be reasonably consistent with the rules and regulations enacted for other NFL stadia."

On September 13, 2005, the Authority, at the urging of the National Football League, (the "NFL"), considered enacting a policy to conduct limited above-the-waist pat-down searches of all persons attending Buccaneers football games. The NFL urged the pat-down policy to protect members of the public who attend NFL games. The NFL concluded that NFL stadia are attractive terrorist targets based on the publicity that would be generated by an attack at an NFL game.[1] The pat-down search policy focuses on the detection of improvised explosive devices ("IED") which might be carried on a person entering a stadium.

In February 2002 the NFL first implemented a policy requiring pat-down searches for Super Bowl XXVII and other special events. The NFL later expanded the policy to require pat-down searches at all football games. These pat-down searches currently are conducted at all NFL events except at the Stadium, where they have been enjoined.

The pat-down searches are conducted by outside screeners. The Authority

---

[1] The NFL cites to the 2004 and 2005 suicide bombings in London and Madrid, threats made to other sporting events, including a soccer venue in Spain, and knowledge that individuals suspected to be tied to terrorist groups had downloaded information from the internet about NFL stadia in St. Louis and Indianapolis. Although the FBI later deemed the threats and the downloads not to present a threat to NFL stadia, these events formed the context in which the NFL decided to request a pat-down policy be enacted at all NFL games.

and the Buccaneers share the expense of the screeners and the Authority oversees how the searches are conducted.[2]

Consistent with the policy urged by the NFL, the pat-down searches at the Stadium focus on the detection of IEDs. At each admission gate, screeners ask people entering the Stadium to hold their arms out to their side, palms up. Screeners inspect the individual for wires, detonators or other telltale signs of an IED. Screeners then run their hands lightly along the sides of the torso, and down the spine. If the individual's skin is exposed, screeners do not make contact with it. If the individual has large pockets, the screener may ask him to empty them for review of any items. Female inspectors conduct searches on females, and male inspectors inspect males.

Johnston was aware of the pat-down policy before the first game of the 2005 season.[3] Press releases announcing the initiation of the pat-down policy were published in the media, on the Buccaneers's website and in a direct communication to season ticket holders. Stadium employees distributed notices about the pat-down policy to cars entering the Stadium parking lot before games.

---

[2] If contraband is discovered during a search, a uniformed law enforcement officer is alerted and investigates.

[3] Before the 2005 season bags, purses, and other containers carried by those attending games were searched. Johnston did not before and does not now object to these searches.

4

Announcements were made over loudspeakers outside of the Stadium before games, advising those who approached the Stadium that pat-downs would be conducted at the entrances. Multiple signs were placed along common walking routes, including those from parking areas to the Stadium, announcing the pat-down policy.

Johnston called the Buccaneers's office before the first game of the 2005 season to discuss the pat-down search policy. Johnston objected to the policy, and claims that he was told that the Buccaneers would not refund the cost of season tickets based solely on his objections. He stated later he would not have accepted a refund even if offered. Having been advised of the policy, Johnston nonetheless presented himself and his ticket at an entrance to the Stadium on three occasions. On each occasion, a screener advised Johnston that a pat-down search would be performed. Johnston verbally objected to the pat-down but allowed it to be conducted so that he could attend the games. After attending the second game Johnston sued the Authority in state court, seeking to enjoin the searches. After suit was filed, Johnston attended a third game, and, after offering his objection, he again submitted to a pat-down search. After the third game the Florida state court enjoined the searches and Johnston attended subsequent games without being subjected to the search.

## II. PRIOR PROCEEDINGS

On October 13, 2005, Johnston filed suit against the Authority and Henry G. Saavedra[4] in the Thirteenth Judicial Circuit of Florida. Johnston challenged the constitutionality of the pat-down searches under the Florida Constitution. Johnston sought nominal damages and an injunction prohibiting the searches. The state court found the searches unconstitutional under the Florida Constitution, and enjoined the Authority from continuing them.

The Authority appealed the ruling and the injunction automatically was stayed under Florida Rule of Appellate Procedure 9.310(b)(2). Johnston moved the Thirteenth Judicial Circuit of Florida to vacate the automatic stay. His motion was denied. Johnston filed an emergency motion with the Florida Second District Court of Appeals to vacate the stay. On November 4, 2005, the motion was granted and the stay of the injunction was vacated.

Johnston thereafter amended his complaint to add a claim under 42 U.S.C. § 1983 that the searches violated the Fourth Amendment to the United States Constitution. On November 4, 2005, the Authority removed the case to the United States District Court for the Middle District of Florida and moved the District

---

[4] Johnston sued Defendant Saavedra in his official capacity as Executive Director of the Authority. Johnston's claims against Saavedra are indistinguishable from his claims against the Authority.

Court to reconsider and vacate the injunction issued by the state court. The District Court denied the motion, finding that Johnston did not consent to the pat-down searches, and that the searches violated the Fourth Amendment. This appeal followed.

## III. STANDARD OF REVIEW

After removal, orders issued by the state court are considered orders of the district court. Jackson v. Am. Sav. Mortg. Corp., 924 F.2d 195, 198 (11th Cir. 1991). This Court reviews for abuse of discretion the grant of a preliminary injunction. Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc., 304 F.3d 1167, 1171 (11th Cir. 2002). "When reviewing a district court's entry of preliminary injunction, we review findings of fact under a clearly erroneous standard, and conclusions of law *de novo*." Horton v. City of St. Augustine, Fla., 272 F.3d 1318, 1326 (11th Cir. 2001).

## IV. DISCUSSION

As the district court stated, this case "is not about the wisdom of . . . [the] pat-down policy, whether the average Buccaneers fan supports or objects to the pat-down searches, or whether a judge believes the pat-downs are wise." The issue in this case is whether Johnston's Fourth Amendment rights were violated by

the pat-down searches.[5]

It is axiomatic that a search conducted pursuant to voluntary consent is valid.  Schneckloth v. Bustamonte, 412 U.S. 218 (1973).  Whether consent is voluntary is a fact question determined according to the totality of the

_____

[5]  Considering Johnston's ticket was only a revocable license to attend games, there is in the Court's opinion at least a question concerning whether Johnston had a constitutional right to pass voluntarily through the Stadium gates without being subjected to a pat-down search, even if he had not consented to one.  Under Florida law, a revocable license is "defined to be an authority to do a particular act, or series of acts, upon another's land without possessing any estate therein."  Devlin v. The Phoenix, Inc., 471 So. 2d 93, 95 (Fla. Ct. App. 1985).  A license "is not a right but is a personal privilege . . . ." Id. "A license . . . is generally revocable at the pleasure of the grantor . . . ."  Dupont v. Whiteside, 721 So. 2d 1259, 1261 (Fla. Ct. App. 1998).  "The distinctive characteristic of a license is that it . . . is, in its very nature, necessarily revocable at will."  Devlin, 417 So. 2d at 95.

The Buccaneers licensed to Johnston a spectator's seat at its games.  The Buccaneers could revoke the license and withdraw permission for Johnston or any other ticket holder to enter the Stadium during games for any reason at the Buccaneers's sole discretion, subject only to a refund.

This case is thus different from that addressed by the Court in Bourgeois v. Peters, 387 F.3d 1303 (11th Cir. 2004).  In Bourgeois, the appellees sought to engage in a annual protest of the training conducted at the School of the Americas at Fort Benning, Georgia.  The demonstrations occurred on public property outside of the Fort Benning Military Installation and not on property of the military installation itself.  The city of Columbus implemented suspicionless magnetometer searches for all seeking to attend the demonstrations.  The city justified the searches in light of past conduct at the demonstrations, including "frenzied dancing," large debris used to erect a "global village," ignition of a smoke bomb, and trespassing on the grounds of Fort Benning.  The city also noted that unrelated protesters at other venues had allegedly instigated instances of violence, and that the Homeland Security threat assessment was elevated.  Id. at 1307.

The search reviewed by the court in Bourgeois impeded individuals from gathering on a public property–city land outside of the Fort Benning installation–to engage in political protests protected by the First Amendment.  Id. at 1325.  While the protestors in Bourgeois had a right to protest on public land that the magnetometer searches burdened impermissibly, Johnston had no parallel right to enter the Stadium for a Buccaneers football game.  None of Johnston's other constitutional rights appear to be impeded by the pat-down searches–not even a property right, as Johnston's ticket granted only a privilege and did not guarantee him a seat.

8

circumstances. Id. at 2049-50; United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989). Consent is determined on a case-by-case basis. United States v. Blake, 888 F.2d at 798. See also United States v. Drayton, 536 U.S. 194, 203-04 (2002). Factors relevant to determining voluntariness include whether the person is in custody, the existence of coercion, the person's awareness of his right to refuse consent, the person's education and intelligence, and whether person believes that incriminating evidence will be found. Blake, 888 F.2d at 798.

Johnston knew that he would be subjected to a pat-down search by the Authority if he presented himself at an entrance to the Stadium to be admitted to a Buccaneers game. That is, he chose to submit voluntarily to the search, stating only a verbal objection followed by his submission to the pat-down search process and his ultimate entry into the Stadium to watch Buccaneers football games.

The Blake factors demonstrate the voluntariness of Johnston's consent. Johnston was not in custody at the time of the search, rather, he presented himself willingly at the search point. The screeners did not coerce Johnston, they merely performed the search to which Johnston submitted. Johnston was not under any express or implied threat of physical or other retribution if he refused to submit to the search. Johnston was well aware of his right to refuse to submit to the pat-down search and did in fact express his objection to the searches to specific

9

screeners and over the telephone to the Buccaneers. At the search point, Johnston pulled his shirt up (apparently to show that he was not wearing an IED) and asked not to be patted down. When screeners insisted on the pat-down before permitting Johnston to enter, Johnston elected to be patted down. Johnston appears from the record to be a man of heightened intelligence and well-educated. The record shows he did not believe that the search would disclose incriminating evidence, as evidenced by his attempt to show screeners he was not carrying any suspicious devices under his shirt.

Considering the totality of the circumstances, the Court concludes that Johnston voluntarily consented to pat-down searches each time he presented himself at a Stadium entrance to attend a game. The record is replete with evidence of the advance notice Johnston was given of the searches including preseason notice, pregame notice, and notice at the search point itself. It was clear error for the district court to find that Johnston did not consent to the pat-down searches which were conducted.

## IV. CONCLUSION

For the reasons stated above, we find that the District Court abused its discretion in making its preliminary finding that Johnston did not consent to the pat-down searches and that Johnston had a right to attend games that was

unconstitutionally infringed.  Accordingly, the Court **REVERSES** the decision of

the District Court and **REMANDS** for further proceedings consistent with this

Order.