[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 18, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-14666

_____

D.C. Docket No. 05-02191-CV-T-27-MAP

GORDON JOHNSTON,

Plaintiff-Appellee,

versus

TAMPA SPORTS AUTHORITY and
HENRY G. SAAVEDRA, in his Official
Capacity as Executive Director of the
Tampa Sports Authority,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 18, 2008)

**ON PETITION FOR REHEARING**

Before BIRCH and FAY, Circuit Judges, and DUFFEY,* District Judge.

PER CURIAM:

_____
        *  Honorable William S. Duffey, Jr., United States District Judge for the Northern District
of Georgia, sitting by designation.

We have carefully reviewed the Appellee's timely petition for rehearing en banc requesting that we reconsider our previous Opinion dated June 26, 2007, published at 490 F.3d 820, reversing the judgment of the District Court and remanding the case. Upon reconsideration of that Opinion, we vacate our prior Opinion and substitute the following revised Opinion in its place.

The issue before the Court is whether the District Court erred when it refused to vacate a Florida state court's order enjoining Appellant Tampa Sports Authority's (the "Authority") policy of conducting pat-down searches of all ticket holders seeking to attend Tampa Bay Buccaneers (the "Buccaneers") games at the Raymond James Stadium in Tampa, Florida (the "Stadium"). We conclude that Appellee Gordon Johnston consented to the searches. The District Court thus erred in not reconsidering and vacating the preliminary injunction. Accordingly, we reverse and remand for further proceedings consistent with this Opinion.

## I.  BACKGROUND

In September 2005, the Authority instituted a policy requiring brief pat-down searches of all persons attending Buccaneers football games. Johnston is a Buccaneers season ticket subscriber who first became a season ticket holder in 2001. The season ticket is, on its face, a revocable license for entry to the Stadium to attend Buccaneers games.

The Stadium is operated by the Authority, a Florida public entity. The Authority grants the Buccaneers, a franchise of the National Football League (the "NFL"), use of the Stadium pursuant to a Stadium Agreement (the "Agreement"). The Agreement provides that the Authority remains responsible for stadium security during Buccaneers games, and obligates the Authority to "make proper rules and regulations for use of the Stadium with regard to all Stadium Events, provided, however, that the content of such rules and regulations shall be reasonably consistent with the rules and regulations enacted for other NFL stadia . . . ."

In February 2002, the NFL first implemented a policy requiring pat-down searches for Super Bowl XXVII and other special events. In August 2005, the NFL Commissioner expanded the policy to require pat-down searches of all patrons entering NFL stadiums. The NFL requires the pat-down policy to protect members of the public who attend NFL games. The NFL concluded that NFL stadiums are attractive terrorist targets based on the publicity that would be generated by an attack at an NFL game.[1] The pat-down search policy focuses on

---

[1] The NFL cites to the 2004 and 2005 suicide bombings in London and Madrid, threats made to other sporting events, including a soccer venue in Spain, and knowledge that individuals suspected to be tied to terrorist groups had downloaded information from the Internet about NFL stadiums in St. Louis and Indianapolis. Although the FBI later deemed the threats and the downloads not to present a threat to NFL stadiums, these events formed the context in which the NFL decided to request that a pat-down policy be enacted at all NFL games.

3

the detection of improvised explosive devices ("IED") which might be carried on a person entering a stadium. These pat-down searches currently are conducted at all NFL events except at the Stadium, where they have been enjoined.

On August 24, 2005, the Buccaneers informed the Authority of the NFL-mandated pat-down searches as a condition for admission to NFL events. On September 13, 2005, the Authority, upon the urging of representatives from the NFL and the Buccaneers, approved a policy to conduct limited above-the-waist pat-down searches of all persons attending Buccaneers football games. The Authority does not require pat-down searches for patrons attending its other non-NFL events at the Stadium, including University of South Florida football games.

The pat-down searches are conducted by outside screeners hired by the Authority. The Authority and the Buccaneers share the expense of the screeners and the Authority oversees how the searches are conducted.[2]

Consistent with the policy urged by the NFL, the pat-down searches at the Stadium focus on the detection of IEDs. At each admission gate, screeners ask people entering the Stadium to hold their arms out to their side, palms up. Screeners inspect the individual for wires, detonators or other telltale signs of an

_____

[2] If contraband is discovered during a search, a uniformed law enforcement officer is alerted and investigates.

4

IED.  Screeners then run their hands lightly along the sides of the torso and down the spine.  If the individual's skin is exposed, screeners do not make contact with it.  If the individual has large pockets, the screener may ask him to empty them for review of any items.  Female inspectors conduct searches on females, and male inspectors inspect males.  Anyone who refuses to be patted down is denied entry to the Stadium.

Johnston was aware of the pat-down policy before the first game of the 2005 season.[3]  Press releases announcing the initiation of the pat-down policy were published in the media, on the Buccaneers' website and in a direct communication to season ticket holders.  Stadium employees distributed notices about the pat-down policy to cars entering the Stadium parking lot before games.  Announcements were made over loudspeakers outside of the Stadium before games, advising those who approached the Stadium that pat-downs would be conducted at the entrances.  Multiple signs were placed along common walking routes, including those from parking areas to the Stadium, announcing the pat-down policy.

Johnston called the Buccaneers' office before the first game of the 2005

_____

[3]  Before the 2005 season, bags, purses, and other containers carried by those attending games were searched.  Johnston did not before and does not now object to these searches.

season to discuss the pat-down search policy. Johnston objected to the policy, and claims that he was told that the Buccaneers would not refund the cost of season tickets based solely on his objections. He stated later he would not have accepted a refund even if offered. Having been advised of the policy, Johnston nonetheless presented himself and his ticket at an entrance to the Stadium on three occasions. On each occasion, a screener advised Johnston that a pat-down search would be performed. Johnston verbally objected to the pat-down but allowed it to be conducted so that he could attend the games. After attending the second game, Johnston sued the Authority in state court seeking to enjoin the searches. Johnston attended a third game after filing suit, and, after offering his objection, he again submitted to a pat-down search. After the third game, the Florida state court enjoined the searches, and Johnston attended subsequent games without being subjected to the search.

## II.   PRIOR PROCEEDINGS

On October 13, 2005, Johnston filed suit against the Authority and Henry G. Saavedra[4] in the Circuit Court for the Thirteenth Judicial Circuit of Florida. Johnston challenged the constitutionality of the pat-down searches under the

---

[4] Johnston sued Defendant Saavedra in his official capacity as Executive Director of the Authority. Johnston's claims against Saavedra are indistinguishable from his claims against the Authority.

6

Florida Constitution. Johnston sought declaratory and injunctive relief prohibiting the searches. On November 2, 2005, the state court found the searches unconstitutional under the Florida Constitution and entered a preliminary injunction halting the searches.

The Authority appealed the ruling, and the preliminary injunction automatically was stayed under Florida Rule of Appellate Procedure 9.310(b)(2). Johnston moved the Thirteenth Judicial Circuit of Florida to vacate the automatic stay. His motion was denied. Johnston filed an emergency motion with the Florida Second District Court of Appeals to vacate the stay. On November 4, 2005, the Second District Court of Appeals granted Johnston's motion and vacated the stay, thus reinstating the preliminary injunction halting the searches.

On November 3, 2005, Johnston amended his complaint to add a claim pursuant to 42 U.S.C. § 1983 that the searches violated the Fourth Amendment to the United States Constitution. On November 30, 2005, the Authority removed the case to the United States District Court for the Middle District of Florida. On December 12, 2005, the Authority moved the District Court to reconsider and vacate the injunction issued by the state court, pursuant to Fed. R. Civ. P. 59(e). The District Court denied the motion, finding that Johnston did not consent to the pat-down searches and that the searches violated the Florida Constitution and the

7

Fourth Amendment to the United States Constitution. This appeal followed.

## III. STANDARD OF REVIEW

After removal, orders issued by the state court are considered orders of the district court. Jackson v. Am. Sav. Mortgage Corp., 924 F.2d 195, 198 (11th Cir. 1991). We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion. Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc., 304 F.3d 1167, 1171 (11th Cir. 2002). If we determine the district court abused its discretion by misapprehending or misapplying the law, we review the district court's factual findings for clear error and the district court's legal conclusions *de novo*. Id. at 1171-72; Horton v. City of St. Augustine, Fla., 272 F.3d 1318, 1326 (11th Cir. 2001).

## IV. DISCUSSION

As the District Court observed, this case "is not about the wisdom of the pat-down policy, whether the average Buccaneers fan supports or objects to the pat-down searches, or whether a judge believes the pat-downs are wise." Johnston v. Tampa Sports Auth., 442 F. Supp. 2d 1257, 1259 (M.D. Fla. 2006). The issue in this case is whether Johnston has shown a substantial likelihood of succeeding on the merits of his claim that the pat-down searches violate his rights under the constitutions of Florida and the United States.

8

The District Court analyzed whether to vacate the injunction under our standards for granting a preliminary injunction. A party seeking a preliminary injunction must demonstrate that: (1) he has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered absent an injunction; (3) the injury to the movant outweighs the injury the proposed injunction would cause to the opposing party; and (4) the proposed injunction would serve the public interest. Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004) (internal quotations omitted). The District Court found that Johnston had met his burden in showing a substantial likelihood of success on the merits of his constitutional claims and that the preliminary injunction would serve the public interest. Johnston, 442 F. Supp. 2d at 1272-73. We find that the District Court abused its discretion by misapplying the consent exception to warrantless searches, and we review the District Court's legal conclusions *de novo*.

Johnston asserts that the pat-down searches at issue are invalid under both the Florida and United States constitutions. In evaluating Johnston's claim under the Florida Constitution, we are compelled to apply the facts of this case to Florida constitutional law as interpreted by the Florida Supreme Court, and, absent a contrary ruling by the Florida Supreme Court, Florida's intermediate appellate courts. McMahan v. Toto, 311 F.3d 1077, 1080 (11th Cir. 2002), cert. denied,

9

Nemesis Veritas, L.P. v. Toto, 539 U.S. 914 (2003); Pardo v. State, 596 So. 2d 665, 666 (Fla. 1992) ("the decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by this Court.") (internal quotation marks omitted).

Article I, Section 12 of the Florida Constitution and the Fourth Amendment to the United States Constitution afford protections against "unreasonable searches and seizures." Fla. Const. Art. 1 § 12;[5] U.S. Const. amend. IV.[6] As the text of the Florida Constitution's search and seizure provision explains, the Florida Constitution affords the same protections against unreasonable searches and

---

[5] The Florida Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated . . . . This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court . . . .

Fla. Const. Art. 1 § 12.

[6] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

10

seizures as the Fourth Amendment, and Florida courts follow opinions of the United States Supreme Court in interpreting the Florida Constitution's search and seizure protections. State v. Peterson, 739 So. 2d 561, 564 (Fla. 1999), cert. denied, 531 U.S. 831 (2000) ("This Court is bound to follow the opinions of the United States Supreme Court concerning Fourth Amendment search and seizure issues."). Our analysis of Johnston's claims under the Fourth Amendment therefore applies equally to Johnston's claims under the Florida Constitution.

The United States Supreme Court has consistently held that under the Fourth Amendment "a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); accord United States v. Santa, 236 F.3d 662, 668 (11th Cir. 2000). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth, 412 U.S. at 219; accord State v. Iaccarino, 767 So. 2d 470, 476 (Fla. Dist. Ct. App. 2000).

Whether consent is voluntary is a fact question determined according to the totality of the circumstances. Schneckloth, 412 U.S. at 226-27; Iaccarino, 767 So.

11

2d at 476; United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989). Consent is determined on a case-by-case basis. Blake, 888 F.2d at 798; United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). Both the federal and Florida courts have enumerated non-exhaustive lists of factors to be considered in performing the analysis. We have previously identified the following non-exhaustive factors to consider in determining voluntariness: whether the person is in custody, the existence of coercion, the person's awareness of his right to refuse consent, the person's education and intelligence, and whether the person believes incriminating evidence will be found. Blake, 888 F.2d at 798 (quoting United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984)). Florida courts look for the existence of express or implied consent and consider the following implied consent factors: (1) whether the defendant was aware his conduct would subject him to search; (2) whether the search was supported by a "vital interest;" (3) whether the searching officer had apparent authority to search and arrest; (4) whether the defendant was advised of his right to refuse; and (5) whether refusal would result in a deprivation of a benefit or right. Iaccarino, 767 So. 2d at 476. Consent is not voluntary if the government conditions receipt of a right or a benefit on the relinquishment of a constitutional right. Bourgeois v. Peters, 387 F.3d 1303, 1324 (11th Cir. 2004) (citing Adams v. James, 784 F.2d 1077, 1080

12

(11th Cir. 1986)); Iaccarino, 767 So. 2d at 479.

For the purposes of our analysis of whether this warrantless search was unconstitutional under the United States and Florida constitutions, we accept the District Court's conclusion that the search was performed by agents of the State. Johnston, 442 F. Supp. 2d at 1264. The question then is whether the District Court abused its discretion in misapplying the consent exception to the facts of this case. We hold that Johnston voluntarily consented to the pat-down searches and thus has not shown a substantial likelihood of success on the merits.[7]

---

[7] Among the exceptions to the Fourth Amendment's general warrant requirement defined by the Supreme Court are exceptions to address the "special needs" of the government beyond the "normal need for law enforcement." Ferguson v. City of Charleston, 532 U.S. 67, 74 n.7 (2001). In evaluating whether to create a "special needs" exception, courts undertake a context-specific inquiry examining the competing public or governmental interests advanced by the searches with the private interests invaded by it. Chandler v. Miller, 520 U.S. 305, 314 (1997) (citing Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665-66 (1989)); United States v. Skipwith, 482 F.2d 1272, 1275 (5th Cir. 1973) (balancing the public necessity of the search against the efficacy of the search and the degree and nature of private intrusion caused by the search). Courts have identified several areas where "special needs" justify an exception to the general prohibition against suspicionless, warrantless searches. E.g., Terry v. Ohio, 392 U.S. 1, 20-25 (1968) (stop and frisk based on individualized suspicion); Warden v. Hayden, 387 U.S. 294 (1967) (hot pursuit exception); United States v. Moreno, 475 F.2d 44 (5th Cir. 1973), cert. denied, 414 U.S. 840 (1973) (airport searches for weapons and explosives); Downing v. Kunzig, 454 F.2d 1230 (6th Cir. 1972) (searches upon entrance to federal buildings).

Because we determine the consent exception applies, we need not also consider whether any other "special needs" exception applies to this case. Considering Johnston's ticket was, on its face, only a revocable license to attend NFL games, there is in our opinion at least a question concerning whether Johnston's constitutional rights would have been violated by the pat-down search, even if he had not consented to one.

The Buccaneers licensed to Johnston a spectator's seat at its games. The Buccaneers could revoke the license and withdraw permission for Johnston or any other ticket holder to enter the Stadium during games for any reason at the Buccaneers' sole discretion, subject only to a refund. Under Florida law, a revocable license is "defined to be an authority to do a particular

13

act, or series of acts, upon another's land without possessing any estate therein." Devlin v. The Phoenix, Inc., 471 So. 2d 93, 95 (Fla. Dist. Ct. App. 1985). A license "is not a right but is a personal privilege . . . ." Id. "A license . . . is generally revocable at the pleasure of the grantor . . . ." Dupont v. Whiteside, 721 So. 2d 1259, 1263 (Fla. Dist. Ct. App. 1998). "The distinctive characteristic of a license is that it . . . is, in its very nature, necessarily revocable at will." Devlin, 471 So. 2d at 95.

We have recently considered the constitutionality of suspicionless, warrantless searches of individuals assembling on public lands to engage in protests protected by the First Amendment. Bourgeois, 387 F.3d 1303. In Bourgeois, the appellants sought to engage in an annual protest of training conducted at the School of the Americas at Fort Benning, Georgia. The demonstrations occurred on public property immediately outside of Fort Benning. The City of Columbus, Georgia instituted a policy requiring suspicionless magnetometer searches of all persons seeking to attend the demonstrations. The City justified the searches in light of past conduct at the demonstrations, including "frenzied dancing," large debris used to erect a "global village," ignition of a smoke bomb, and trespassing on the grounds of Fort Benning, in violation of 18 U.S.C. § 1382. The City also noted that unrelated protesters at other venues had allegedly instigated instances of violence, and that the Homeland Security threat assessment was elevated. Id. at 1307, 1312. We held this suspicionless search unconstitutional in violation of the First and Fourth Amendments, in part because the City had not shown its policy fell within one of the several exceptions to the Fourth Amendment's requirements.

We note the many material differences between the search policy instituted in Bourgeois and the pat-down search at issue in this case. The search reviewed by the Court in Bourgeois impeded individuals from gathering on public property – city land outside of the Fort Benning military installation – to engage in political protests protected by the First Amendment. Id. at 1325. The protestors in Bourgeois had the same general right to be in the public space shared by all citizens and a constitutional right to protest on the public lands. The City's suspicionless searches burdened both of those rights impermissibly. We also note that the magnetometer policy was developed and enacted by the City, and, as we stated, was enacted to serve the City's normal law enforcement function. Id. at 1312-1313 ("it is difficult to see how public safety could be seen as a governmental interest independent of law enforcement; the two are inextricably intertwined."); see also Iaccarino, 767 So. 2d at 473 (suspicionless searches of concert patrons required by city officers as a condition for granting a permit to hold a music festival).

Johnston had no parallel constitutional right to enter the Stadium for a Buccaneers football game. None of Johnston's other rights appear to be impeded by the pat-down searches – not even a property right, as Johnston's ticket granted only a privilege and did not guarantee him a seat. Johnston simply had no right to be in the Stadium during an NFL football game, and the revocable license granted by his ticket made clear he could be excluded for any reason. Unlike the City's policy in Bourgeois and the permit conditions imposed by the government in Iaccarino, the pat-down policy in this case was developed and mandated by the NFL Commissioner and applied exclusively to NFL events. The NFL and the Buccaneers do not have a law enforcement function that could have been served by the pat-downs; the record reflects instead that the NFL crafted the policy solely to protect its patrons from harm. It appears from the record that the pat-

14

Johnston knew well in advance that he would be subjected to a pat-down search by the Authority if he presented himself at an entrance to the Stadium to be admitted to a Buccaneers game. That is, he chose to submit voluntarily to the search on two occasions, stating only a verbal objection followed by his submission to the pat-down search process and his ultimate entry into the Stadium to watch Buccaneers football games.

The factors we enumerated in United States v. Blake demonstrate the voluntariness of Johnston's consent. Johnston was not in custody at the time of the search, rather, he presented himself willingly at the search point. The screeners did not coerce Johnston, they merely performed the search to which Johnston submitted. Johnston was well aware of his right to refuse to submit to the pat-down search and did in fact express his objection to the searches to specific screeners and over the telephone to the Buccaneers before the searches were implemented. At the search point, Johnston pulled his shirt up (apparently to show that he was not wearing an IED) and asked not to be patted down. When screeners insisted on the pat-down before permitting Johnston to enter, Johnston elected to be patted down and thereby gain entrance to the Stadium. Johnston

down searches did not seek to identify any illegal items other than IEDs.

15

appears from the record to be a man of heightened intelligence and well-educated. The record shows he did not believe that the search would disclose incriminating evidence, as shown by his attempt to show screeners he was not carrying any suspicious devices under his shirt.

Johnston also impliedly consented to the search under the factors for implied consent developed by Florida courts. Johnston was well-aware his insistence in entering the Stadium would cause him to be subject to a search. The record also reflects that Johnston was aware of his ability to refuse to be searched and leave the Stadium. There is no evidence that the Authority would have detained Johnston if he refused, or that Johnston otherwise believed the searches to be compulsory.

We also conclude the searches supported a "vital interest." The NFL and the Buccaneers instituted the pat-down policy specifically to guard against mass casualties at NFL games from a potential terrorist attack. We cannot doubt the NFL's interest in protecting its patrons. Unlike the searches for drugs, bottles, and cans considered in Iaccarino, 767 So. 2d at 473, the pat-down searches in this case supported an interest well beyond general law enforcement. The NFL quite clearly instituted the pat-down policy with the intent of preventing terrorist attacks and ensuring the safety of persons in the Stadium. See id. at 478 ("We agree that

16

the interest in protecting the performers from projectiles is a 'vital interest' that would justify a search for those items which could be used as projectiles.").

The District Court found that the consent exception did not apply in this case, in part, because of the "unconstitutional condition" doctrine developed by federal and Florida courts. "The doctrine of unconstitutional conditions prohibits terminating benefits, though not classified as entitlements, if the termination is based on motivations that other constitutional provisions proscribe." Adams, 784 F.2d at 1080; accord Bourgeois, 387 F.3d at 1324 ("This is a classic 'unconstitutional condition,' in which the government conditions receipt of a benefit or privilege on the relinquishment of a constitutional right."); Iaccarino, 767 So. 2d at 476. The District Court erred in its application of the unconstitutional condition doctrine because in this case the condition for entry was imposed by the NFL and the Buccaneers, both private entities, and not the government. As we noted, Johnston did not have any right or entitlement to enter the Stadium. His purchase of a ticket granted him at most a revocable license to a seat. As is typical of sporting events, the NFL and the Buccaneers explicitly retained the right to exclude him from the Stadium for any reason. The NFL chose to impose a pat-down as a condition for entry. Although the Authority acquiesced to the NFL's requests by hiring screeners to conduct pat-downs, the conclusion

17

that this policy was the NFL's – and not the Authority's – condition for entry is reinforced by the Authority's security measures at other non-NFL events at the Stadium, including collegiate football games, where the Authority does not conduct pat-downs.

In other cases where we have used the unconstitutional conditions doctrine to invalidate consent, we found that it was the government imposing the condition and performing the search. E.g., Bourgeois, 387 F.3d at 1324 (magnetometer searches instituted by city policy). Several courts have analyzed the "unconstitutional conditions" doctrine with respect to entry to large public gatherings such as rock concerts. In each of these cases, a government search upon entry was unconstitutional because it required the patron to choose between assertion of his constitutional rights and losing paid admission to the concerts. In each of these cases the entity imposing the condition was the government itself. E.g., Nakamoto v. Fasi, 635 P.2d 946, 949 (Haw. 1981) (inspection policy imposed by the City of Honolulu); Gaioni v. Folmar, 460 F. Supp. 10, 12 (M.D. Ala. 1978) (search policy instituted by the Mayor of the City of Montgomery); Stroeber v. Comm'n Veteran's Auditorium, 453 F. Supp. 926, 929 (S.D. Iowa 1977) (search policy instituted by officials and the chief of police of the City of Des Moines); Wheaton v. Hagan, 435 F. Supp. 1134, 1139 (M.D.N.C. 1977)

18

(search policy instituted by officials of the City of Greensboro). Cases considered by Florida courts reveal the same circumstance of the government imposing an unconstitutional condition. E.g., Iaccarino, 767 So. 2d at 473 (search policy for entry to music festival on private property mandated by city officials as a condition for the promoter's permit to hold the festival).

In this case, the government had no role in formulating or mandating the pat-down policy. The policy exists solely because of the NFL's mandate. Because the condition for entry was imposed by a private party, Johnston was not forced by the government to choose between assertion of his constitutional rights and obtaining a benefit to which he was entitled. The NFL's condition does not invalidate Johnston's voluntary consent to the pat-downs. The unconstitutional conditions doctrine does not apply to these searches required by a private entity.

Considering the totality of the circumstances, the Court concludes that Johnston voluntarily consented to pat-down searches each time he presented himself at a Stadium entrance to attend a game. The record is replete with evidence of the advance notice Johnston was given of the searches including preseason notice, pregame notice, and notice at the search point itself. It was clear error for the District Court to find that Johnston did not voluntarily consent to the pat-down searches.

## V.   CONCLUSION

For the reasons stated above, we find under the unique circumstances here that the District Court abused its discretion in making its preliminary finding that Johnston did not consent to the pat-down searches and that Johnston had a right to attend games that was unconstitutionally infringed.  Upon *de novo* consideration of the District Court's conclusions of law, we hold that Johnston has not shown a substantial likelihood of success on the merits of his constitutional claims under the Florida and United States constitutions.  Accordingly, we **REVERSE** the decision of the District Court and **REMAND** for further proceedings consistent with this Opinion.

**SO ORDERED**.